[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McKelton,* Slip Opinion No. 2016-Ohio-5735.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5735

THE STATE OF OHIO, APPELLEE, *v.* MCKELTON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McKelton,* Slip Opinion No. 2016-Ohio-5735.]

*Criminal Law—Aggravated murder—Death penalty—Conviction and death penalty affirmed.*

(No. 2010-2198—Submitted January 13, 2015—Decided September 13, 2016.)

APPEAL from the Court of Common Pleas of Butler County,

No. CR2010-02-0189.

_____

LANZINGER, J.

{¶ 1} Calvin McKelton appeals his convictions of the February 2009 aggravated murder of Germaine ("Mick") Evans and the July 2008 murder of Margaret ("Missy") Allen. For the reasons that follow, we reject each proposition of law and affirm the convictions and death sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Background

{¶ 2} In February 2010, the state charged McKelton with the murder of Allen, R.C. 2903.02(B), and the aggravated murder of Evans, R.C. 2903.01(A). The aggravated-murder charge carried a firearm specification, R.C. 2941.145, and two death specifications, R.C. 2929.04(A)(3) (escaping detection) and (A)(8) (killing to prevent testimony in a criminal proceeding).

{¶ 3} McKelton was also charged with two counts of felonious assault, R.C. 2903.11(A)(1), and two counts of domestic violence against Allen, R.C. 2919.25(A); gross abuse of her corpse, R.C. 2927.01(B); aggravated robbery and aggravated arson, R.C. 2911.01(A)(3) and 2909.02(A)(2); tampering with evidence, R.C. 2921.12(A)(1); and intimidating a witness in a criminal case, R.C. 2921.04(B). The state, with leave of court, dismissed the aggravated-robbery charge before trial.

{¶ 4} A jury trial began in October 2010.

### B. The State's Case-in-Chief

#### 1. Domestic Abuse of Missy Allen

{¶ 5} Missy Allen, a criminal-defense attorney who had represented Calvin McKelton, began dating him in 2006 or 2007. By 2008, McKelton was living with Allen and her nieces, T.W. and Z.D., at Allen's home in Butler County.

{¶ 6} T.W., then a teenager, testified that she had witnessed physically violent arguments between McKelton and Allen while they were living together. One time she found McKelton on top of Allen, choking her. During another altercation, Allen asked T.W. to call the police, but McKelton took the phone from T.W. and threw it on a counter. T.W. said that after things "start[ed] to get bad," Allen told her not to say anything about what happened in her house.

{¶ 7} A document on Allen's home computer, created on September 13, 2007, chronicled abuse. The first-person narrative described an incident during

which McKelton hit, kicked, and pushed Allen and then choked her twice, once with such force that she nearly lost consciousness. She listed injuries to her face, right side, right leg, back, and head as well as blood clots in her eyes due to "the loss of air." She was afraid because McKelton had threatened her and her niece. She indicated that she intended to prosecute and to request a temporary protection order and a high bond.

{¶ 8} A notebook found in Allen's home office contained handwritten notes that repeatedly mentioned the name "Calvin." Charia Mam, a friend of Allen's, testified that the handwriting was Allen's. Allen described McKelton's grabbing her by the neck, hitting her lip, threatening to burn her eye with a cigarette, and pushing her down "b/c tried to choke." Allen also described calling for her niece to call 9-1-1. An undated apology note to Allen, written in McKelton's handwriting, stated: "I Love u baby, I don't ever want to hurt u again. * * * I want 2 say sorry 2 you and 2 God for what Ive done."

{¶ 9} Z.D., then 11 years old, testified that on May 4, 2008, she heard McKelton yelling and Allen screaming from the direction of the garage. She called 9-1-1. Officer Kelly Smith was dispatched to Allen's home, but McKelton and Allen were gone when she arrived. The officer said that Z.D. was visibly shaking and acting with "extreme fear." McKelton returned while Smith was still at the house. He "burst through the door" yelling Z.D.'s name and told Smith "to bounce [her] ass out of the house." Allen then called the house and told the officer that she was in the hospital. Z.D. testified that Allen later told her she was "kind of mad" that Z.D. had called 9-1-1 and had not come into the garage.

{¶ 10} Allen gave several accounts of her argument with McKelton. She told police that McKelton had not harmed her and "if anything, she essentially provoked him" by shoving him. She said that she tripped over something in the garage. She told hospital personnel that she had fallen over a lawn mower or bike,

told a children's services representative that she had fallen over a chair, and told her physical therapist that she had fallen down a step.

{¶ 11} Allen's injury required surgery to place four screws in her ankle as well as physical therapy. According to two friends, Shaunda Luther and Mam, Allen became "increasingly depressed," "somewhat detached," and "distant" after the injury. McKelton was always around, and it was hard for Mam and Luther to have meaningful conversations with Allen. Because she could not drive, she depended on McKelton to take her to medical appointments and to court. And Luther said that Allen was depressed because she could not make money to support herself. Her bank account was overdrawn as of July 25, 2008.

{¶ 12} Mam and Luther both testified that Allen had expressed concern about McKelton's jealousy. Allen told Mam that McKelton "went through her phone and text record frequently, and it always ended in an argument." She also told Mam that McKelton would kill her if he knew another man had sent her flowers or if he thought she had slept with his friend.

{¶ 13} In July 2008, Allen told Mam that she thought she was pregnant. She told her friend that she feared having a baby would tie her to McKelton forever but that McKelton would kill her if she had an abortion without telling him. Allen suffered a miscarriage later that month.

### 2. The Murder of Missy Allen

{¶ 14} On July 27, 2008, a woman was found dead in woods on the east side of Cincinnati. A piece of plastic resembling a shower-curtain liner was wrapped around the victim's thighs, and a bag of counterfeit drugs lay near her body.

{¶ 15} Jan Gorniak, D.O., then a deputy coroner for Hamilton County, performed an autopsy on July 28, 2008. She classified the death as a homicide caused by strangulation. Gorniak could not determine a precise time of death, but she

estimated that the body had been in the woods for one and one-half to three days. After the autopsy, police identified the woman as Allen.

### a. Physical evidence

{¶ 16} Police then searched Allen's home. The front door was locked and the security system was activated, but inside they found a burn mark in the master bedroom and several items that later tested positive for gasoline or gasoline components. Officers collected samples of drywall that appeared to have blood on them; the samples were later confirmed to have a DNA profile consistent with Allen's DNA profile. Two items—a cigarette butt and the door to the garage, which had a smear that appeared to be blood—had a DNA profile consistent with McKelton's DNA profile.

{¶ 17} Valuable items—including Allen's purse—were in plain view, apparently undisturbed. Police found a long piece of weed-eater cord on the kitchen floor. There was a shower curtain on the hallway floor but no sign of a shower-curtain liner.

{¶ 18} Allen's car was found in the village of Golf Manor shortly after midnight on July 29, 2008. It was locked and did not appear to have been tampered with. Cell-phone records indicated that the last outgoing call on Allen's phone was at 8:27 p.m. on July 25, 2008, to a phone number used by McKelton. Her laptop computer was last used around 4 p.m. that day.

### b. Investigation of McKelton

{¶ 19} On July 29, McKelton came to the Fairfield Police Department. After he signed a *Miranda* waiver, he asked if there were any warrants for him. There were not. McKelton did not answer any other questions. Officers noted small abrasions (possibly burn marks) on McKelton's hands. They photographed him and took fingerprints, DNA samples, and fingernail scrapings. The DNA samples were not consistent with male DNA collected from Allen's fingernails.

**{¶ 20}** Based on cell-phone records, police believed that McKelton had been near Allen's house on the night of July 25 and the morning of July 26. He made repeated calls that bounced off the Sprint cell-phone tower closest to Allen's house between 9:02 p.m. and 10:52 p.m. on July 25. McKelton's next 18 calls bounced off several towers, but he was near the Sprint tower closest to Allen's house again between 8:01 a.m. and 9:17 a.m. on July 26.

**{¶ 21}** Later, police learned of a possible eyewitness to Allen's murder: McKelton's friend, Evans. Andre Ridley, a friend of Evans's, testified that Evans had told him about Allen's death a few days after her body was found. Evans told Ridley that he had been at Allen's house when he heard her and McKelton fighting in another room. Evans walked in and saw McKelton choking Allen. McKelton then smacked Allen, telling her to wake up, but she did not. The men "started staging the scene as a robbery." Evans told Ridley that he and McKelton had wrapped up Allen's body and put it in the car, and McKelton set fire to the house. The two men drove to a wooded area and dumped the body. McKelton threw some drugs beside it.

**{¶ 22}** According to Ridley, Evans said that McKelton had assured him that he could be charged only with abuse of a corpse. Evans also reported that McKelton gave him 20 ounces of cocaine (worth $20,000 to $40,000). Ridley did not speak with police until months later, after Evans was killed.

**{¶ 23}** Audrey Dumas testified that she had been with McKelton the night that Allen died. Dumas said that she went out with McKelton one weekend night in late July 2008. McKelton picked her up around 11:15 p.m. in a black BMW, which she recognized as Allen's car. They went to a club until 2:15 or 2:30 a.m. and then drove around downtown with McKelton's friends. McKelton brought her home around 3:30 or 4:00 a.m.

**{¶ 24}** On July 25, McKelton was near Allen's house at 10:52 p.m. After that, he made or received seven calls—which bounced off different cell-phone

towers—before a call bounced off a tower in the vicinity of Dumas's house at 2:25 a.m. on July 26.

### 3. The Murder of Mick Evans

**{¶ 25}** Police did not learn that Evans may have witnessed Allen's murder until seven months after Allen's death. Detective Jenny Luke obtained a subpoena for Evans's DNA and began trying to locate him.

**{¶ 26}** On February 24, 2009, Luke telephoned Evans's sister, Crystal Evans, and asked her to tell Evans that police wanted to talk to him about Allen's death. Luke did not realize that Crystal had been dating McKelton since September 2008 and that he was living with her. Crystal testified that McKelton easily could have overheard her conversation with Luke. McKelton was at Crystal's home when she called Evans to relay Luke's message.

**{¶ 27}** On March 1, Evans's body was found at the bottom of steps leading into a city park. Four .40 caliber shell casings were nearby. Neighborhood residents reported to police that they had heard four or five gunshots near the park between 9:00 p.m. and midnight on February 27, 2009.

**{¶ 28}** Gretel Stephens, M.D., a deputy coroner for Hamilton County, performed an autopsy the next day. She gave her opinion that Evans had been dead more than 24 hours and possibly for two or three days. He had been killed by a single gunshot wound to the back of the head on the left side. The shot had been fired at "very, very close" range, or possibly even with contact. Stephens recovered bullet fragments that were consistent with a .40 caliber Smith & Wesson Sigma Series semiautomatic.

**{¶ 29}** Police never found the murder weapon. However, the state did introduce testimony from Allen's teenaged niece, T.W., about a time when she saw McKelton with a gun, which she said looked like a .40 caliber automatic.

**{¶ 30}** Cell-phone records indicated that Evans had last placed a call at 9:55 p.m. and last sent a text message at 10:01 p.m. on February 27. According to

Crystal, Evans did not trust anyone, so "[s]omebody close to him" must have shot him.

{¶ 31} Crystal provided an alibi for McKelton on the night of February 27, 2009. She told police that he had arrived home before 9 p.m. but at trial admitted that it may have been later. She said that after McKelton got home, she went out to buy candy. She testified that when she returned home around 10:00 p.m., McKelton was gone. Crystal called him, and he said he had gone to get cigarettes. McKelton walked in with a pack of cigarettes about five minutes later and the two stayed in for the rest of the night. On cross-examination, Crystal said that she had called McKelton at 9:22 p.m. and he arrived home for the night a few minutes later.

{¶ 32} Cell-phone records indicate that from 9:10 to 9:51 p.m. on February 27, several calls were made back and forth among McKelton, Brian "Red" Adams, an old friend of McKelton's, and Audrey Dumas, McKelton's former girlfriend. Dumas then called McKelton's number more than two dozen times, ending at 11:37 p.m. Dumas testified that at 11:01 p.m., she was parked outside Crystal's apartment, believed McKelton was inside, and tried to disrupt their time together by sending text messages telling him to come out. Later, beginning at 2:32 a.m., McKelton called Dumas's and Red's numbers multiple times. Crystal testified she did not recall waking up or hearing McKelton on the phone during the night.

{¶ 33} After Evans's murder, Crystal avoided McKelton for several weeks, but they resumed their relationship. In June 2010, she gave birth to his son. She regularly visited McKelton in jail as he awaited trial, and they exchanged frequent phone calls and letters. In letters, he reminded her that he was with her the night Evans died and told her to stop "com[ing] at" him like she did not "know for [sure he] was at home wit[h her]." He explained that phone records showed that Evans died at 10:00 p.m. and told Crystal, "[W]e were home asleep at ten."

8

### 4. McKelton's Admissions

{¶ 34} Multiple witnesses testified that McKelton implicated himself in the deaths of Allen and Evans. Three of them—Marcus Sneed, Charles Bryant, and Lemuel Johnson—were informants charged with other offenses.

{¶ 35} Sneed, who had grown up in the same neighborhood as McKelton, testified that he had run into McKelton at a club and confronted him about Allen's death. McKelton told Sneed that he had choked Allen during "a heated argument" but that he "didn't mean to." McKelton mentioned something about Allen's pregnancy and about her threatening him with her knowledge of his crimes.

{¶ 36} McKelton also told Sneed that "a friend help[ed] him" get rid of Allen's body. Sneed confronted McKelton again after hearing rumors about Evans's death. McKelton stated that he had had to kill Evans because Evans "was the only guy that could link him to the murder." Sneed did not report this information to police until he was later arrested on federal drug-conspiracy charges.

{¶ 37} Bryant, who had met McKelton during a 2003 incarceration, testified that McKelton had told him about the deaths of Allen and Evans. McKelton said that he had been involved with an attorney and choked her during an argument about whether she was pregnant with someone else's baby. McKelton also reminded Bryant about what had happened to Evans, which Bryant interpreted as a threat. Bryant did not come forward with this information until he was incarcerated on new charges.

{¶ 38} Johnson testified that McKelton had confessed to both murders while they were discussing drug-related business. According to Johnson, McKelton needed money and was trying to convince him to let him take care of some witnesses for him. McKelton described situations in which he had eliminated witnesses in the past. He said that he had been with Evans's sister when a detective called looking for Evans to discuss Allen's death. He explained that Evans had been a "weak link" who could connect him to Allen's murder, so he had to kill him

before the detective found him. But Johnson did not report this conversation until he was awaiting sentencing for a federal drug offense.

{¶ 39} The state also called Gerald Wilson and Michael Nix, two acquaintances of McKelton's who had reported hearing McKelton admit responsibility for Allen's death.

{¶ 40} Prior to the trial, Wilson told police about a conversation that he had had with Michael Howell and McKelton in April or May, 2009. One night, Howell gave Wilson a ride; McKelton was in the front passenger seat, texting someone. McKelton commented, "Man, that bitch ain't giving my shit to nobody. If she did, I'm gonna choke her like I did Margaret and get away with it." Howell warned McKelton to watch what he said. McKelton responded that Wilson "ain't gonna do nothing. If he did, he gonna end up like Mick did." At trial, Wilson recanted and insisted that he knew nothing about Allen's murder, so the prosecutor played a recording of his original police statement for the jury.

{¶ 41} Nix refused to testify for the state at trial, so Detective David Gregory testified about his prior statements under the doctrine of forfeiture by wrongdoing. According to Gregory, Nix had asked McKelton about Allen, and McKelton said that things "got out of hand, and he didn't mean to do it." Gregory also testified that Nix said that Evans, McKelton, Red, and Lamar Simmons were in his house around 11 p.m. on February 27, 2009, when he came home. Nix said that the men left about an hour later. He never saw Evans again.

{¶ 42} Sheridan Evans, the mother of Evans and Crystal, testified that McKelton spoke to her less than a week after Allen's body was found. He "was crying very hard" and said that "he loved Missy and it was a mistake." McKelton told Sheridan that he had "tried to revive [Allen] for 10 minutes, but [he] couldn't bring her back." Sheridan also testified that McKelton and Red came to speak with her after she met with homicide detectives in March 2009. During the conversation,

Sheridan mentioned rumors that McKelton had killed Evans. McKelton denied the rumors but said, "I don't want to see nothing else happen to none of your kids."

### C. The Defense Case

**{¶ 43}** Defense counsel did not present any witnesses during the first phase of the trial. However, they introduced almost 30 exhibits, including additional crime-scene photos, the transcript of a police interview with Crystal, and some additional phone records.

### D. Verdict and Sentencing

**{¶ 44}** The jury convicted McKelton on all counts and specifications except Count 11, intimidation of a witness. The trial court merged the death specifications before sentencing, and the state elected to proceed on R.C. 2929.04(A)(8), murdering a witness to prevent his testimony in a criminal proceeding. After the mitigation phase and the jury recommendation, the trial court sentenced McKelton to death for the aggravated murder of Evans. The court also sentenced him to 15 years to life in prison for Allen's murder and to a total of 25 years for the remaining convictions.

**{¶ 45}** McKelton now appeals, raising 21 propositions of law. We address his propositions out of order for ease of analysis.

## II. ANALYSIS

### A. Pretrial Issues

#### 1. Nondisclosure of Witnesses: Proposition of Law No. 2

**{¶ 46}** In his second proposition of law, McKelton challenges the prosecutor's failure to disclose eight witness names until the night before his trial began.

#### a. The nondisclosure hearing

**{¶ 47}** The state originally filed a certification for nondisclosure, pursuant to Crim.R. 16(D), of 23 witness names. After a request from the defense, the trial judge referred the matter to another judge to hold an in camera hearing. By the

11

time the hearing took place, the prosecutor had disclosed all but eight witnesses, seven of whom would testify at trial. At the hearing, the prosecutor argued that disclosure would subject the witnesses or a third party to potential harm, coercion, or intimidation. He offered four pieces of evidence in support.

{¶ 48} First, McKelton had been convicted of intimidating a witness in 2003. Second, in a jailhouse letter to Crystal, McKelton said that they should post witness names in a public place when they got them. Third, in a phone call shortly after McKelton's arrest, an associate of McKelton's told him not to worry because they would "John Brown this case." The prosecutor explained the reference: a Cincinnati homicide defendant named John Brown had been acquitted when every witness against him disappeared or recanted on the eve of his trial. Fourth, a witness whose name *had* been disclosed, Michael Nix, had recently been shot at shortly after a known associate of McKelton's had asked Nix about McKelton's case.

{¶ 49} The judge asked what motivated the state's heightened concern for these eight witnesses. The prosecutor explained that two witnesses "were extremely afraid to have their names disclosed" and likely would not have agreed to testify absent nondisclosure. In addition, three witnesses, who were then incarcerated, were fearful for themselves and their families. The prosecutor said nothing specific about two witnesses.

{¶ 50} The judge upheld the nondisclosure as a proper exercise of prosecutorial discretion. The prosecutor gave the defense the undisclosed witnesses' names and all but one of the statements on the evening before trial. One statement was not provided until the next morning, shortly before the trial began.

### b. Crim.R. 16(D) and (F)

{¶ 51} As an exception to the general rule requiring the disclosure of witness names prior to trial, a prosecutor may seek relief from disclosure under Crim.R. 16(D)(1) if the prosecutor has "reasonable, articulable grounds to believe

that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion." Such grounds include "the nature of the case, the specific course of conduct of one or more parties, threats or prior instances of witness tampering or intimidation, * * * and any other relevant information." Crim.R. 16(D).

**{¶ 52}** Upon a defendant's motion, an in camera hearing must be conducted seven days prior to trial. Crim.R. 16(F). If the trial court finds an abuse of prosecutorial discretion, then the prosecutor must immediately disclose the material. 2010 Staff Note, Crim.R. 16(F). Otherwise, the material must be disclosed "no later than commencement of trial." Crim.R. 16(F)(5). We review a lower court's rulings on discovery matters for an abuse of discretion. *State ex rel. Duncan v. Middlefield*, 120 Ohio St.3d 313, 2008-Ohio-6200, 898 N.E.2d 952, ¶ 27.

**{¶ 53}** McKelton argues first that the court should have found an abuse of prosecutorial discretion under Crim.R. 16(D)(1) because the prosecutor's grounds were about only McKelton and the case generally and were not specific to each witness. But Crim.R. 16 specifically contemplates nondisclosure for the reasons the prosecutor cited here: the nature of the case against McKelton, his past conviction for intimidating a witness, and evidence that he had sought to intimidate witnesses in this case.

**{¶ 54}** Second, McKelton argues that the prosecutor could not rely on the undisclosed witnesses' representations that they feared McKelton's knowing that they would testify. McKelton contends that the prosecutor, not the witness, is responsible for assessing any possible danger to a witness. While the rules vest the prosecutor with responsibility for making the nondisclosure determination, a prosecutor is not precluded from taking a witness's own impressions into account when deciding whether to disclose that witness's identity. A witness's fear of

reprisal is relevant to the question whether disclosure might compromise the witness's safety.

**{¶ 55}** Third, McKelton argues that the prosecutor acted arbitrarily because the nondisclosed witnesses offered testimony similar to, but less damaging than, other witnesses whose names *were* disclosed. Crim.R. 16 does not require the state to explain its reasons for choosing to *disclose*, and McKelton did not request such an explanation.

**{¶ 56}** Finally, McKelton says that the eight undisclosed witness names should have been disclosed at least seven days before trial. He ignores the language of Crim.R. 16(F), which plainly states that when a trial court finds no abuse of discretion in a prosecutor's nondisclosure decision, materials must be disclosed no later than the commencement of trial.

**{¶ 57}** In sum, the trial court did not abuse its discretion by affirming the certificate of nondisclosure as a proper exercise of prosecutorial discretion.

### c. Constitutional challenges to late disclosure

**{¶ 58}** McKelton also argues that the late disclosure of these witnesses violated several of his constitutional rights.

**{¶ 59}** First, he says that the late disclosure violated the Confrontation Clause of the Sixth Amendment to the U.S. Constitution. A defendant's confrontation rights may be "legitimately constrained" by rules of discovery. *State v. Williams*, 23 Ohio St.3d 16, 18, 490 N.E.2d 906 (1986). We have already rejected a confrontation challenge to the predecessor to Crim.R. 16(D), former Crim.R. 16(B)(1)(e), 34 Ohio St.2d li, at lii-liii, which permitted trial courts to control the disclosure of information that might subject a witness to physical harm or coercion. *Williams* at 18-19. And in any event, he *did* have a meaningful opportunity to confront the witnesses against him: the witnesses were disclosed before trial, and defense counsel cross-examined each one who testified. *See State*

*v. Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, ¶ 22.

**{¶ 60}** Alternatively, McKelton claims that the late disclosure violated his right to due process and a fair trial. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits prosecutors from concealing evidence favorable to a defendant, but "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Prosecutors are not constitutionally required to "reveal before trial the names of all witnesses who will testify unfavorably." *Id*. Instead, "a trial court has broad discretion to postpone disclosure of a prospective witness's identity in order to protect his or her safety." *Alvarado v. Superior Court*, 23 Cal.4th 1121, 1150, 99 Cal.Rptr.2d 149, 5 P.3d 203 (Cal.2000). Here, the trial court did just that. Therefore, McKelton cannot demonstrate a violation of his right to due process or a fair trial.

**{¶ 61}** Finally, McKelton alleges that the delayed disclosure denied him his right to effective assistance of counsel because it deprived his attorneys of an adequate opportunity to investigate and prepare his defense. To prevail on this claim, he must show both that the nondisclosure caused counsel's performance to be deficient and that he suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For reasons explained in response to the 1st, 15th, and 16th, propositions of law, McKelton has not met his burden.

**{¶ 62}** For these reasons, we reject proposition of law No. 2.

### 2. *Withdrawal of Counsel and Continuances: Proposition of Law No. 1*

**{¶ 63}** In his first proposition of law, McKelton argues that the trial court erred by denying his court-appointed counsel's request to withdraw from representation and his corresponding motion to remove those counsel. He claims that the error in refusing counsel's request to withdraw "was compounded by the

trial court's failure to grant repeated requests for a continuance" and argues that these errors violated his right to due process, a fair trial, and effective assistance of counsel.

### a. Withdrawal of counsel

{¶ 64} McKelton claims that the trial court should have removed John Gregory Howard and Melynda Cook, his two court-appointed attorneys, as counsel.

### (1) Factual background

{¶ 65} Initially, McKelton retained attorney Richard Goldberg. At McKelton's arraignment in February 2010, Goldberg informed the court that he lacked experience trying capital cases. He also explained that McKelton had become indigent and asked the court to appoint counsel under former Sup.R. 20, 105 Ohio St.3d CXLV.[1] Goldberg also sought "permission to stay on" as counsel, if the state did not object. The trial judge appointed Howard as lead counsel and Cook as co-counsel because he was unsure "what the status of [Goldberg's] participation" would be.

{¶ 66} On September 14, 2010, Goldberg, Howard, and Cook moved for leave to withdraw, for the appointment of new counsel, and for a continuance so new counsel could prepare for trial. Two days later, McKelton filed a handwritten motion asking the "court to remove all counsel because of irreconcilable differences, lawyer misconduct, conflict of interest, misrepresentation, personal conflict and a complete lack of communication."

{¶ 67} Goldberg was permitted to withdraw because of a conflict of interest. But Cook and Howard cited only "a breakdown in the attorney client relationship"

---

[1] McKelton claims that the trial court violated former Sup.R. 20, 105 Ohio St.3d CXLV, by appointing two lawyers even though he had retained Goldberg. But counsel were appointed at Goldberg's request, and McKelton cannot take advantage of an error that he invited. *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 10. Moreover, McKelton arguably benefited: the two certified capital attorneys supplemented the efforts of Goldberg, who lacked capital-defense experience.

as the basis for their request. Howard explained that McKelton did not trust his appointed counsel and would no longer cooperate in preparing his defense.

{¶ 68} McKelton told the trial judge that counsel had tried to pressure him into accepting a plea bargain. He claimed that his attorneys and the prosecutor had "conspired" to "coerce" him to accept a plea offer and that Cook was "outraged"—even making a racist comment—when he refused. McKelton also said that Howard and Cook had failed to effectively communicate with him, adequately prepare for trial, use his money well, or hire the necessary defense experts.

{¶ 69} The trial judge denied Howard and Cook's motion to withdraw, finding that they were competent and had prepared the case "diligently." The judge reasoned that communication had broken down due to McKelton's rejection of counsel's legal advice and refusal to cooperate.

### (2) Analysis

{¶ 70} We review a lower court's decisions about whether to discharge and replace court-appointed counsel for an abuse of discretion. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 135. A defendant may establish good cause to substitute new counsel by demonstrating "a 'complete breakdown in communication' between the defendant and appointed counsel." *State v. Cowans*, 87 Ohio St.3d 68, 73, 717 N.E.2d 298 (1999), quoting *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir.1972).

{¶ 71} McKelton suggests several reasons why the trial court erred by not dismissing Howard and Cook. First, he claims that the attorney-client relationship completely broke down when counsel encouraged him to accept a plea bargain. But disagreements—such as disagreement over the merits of a plea offer—" 'between the attorney and client over trial tactics or approach * * * do not warrant a substitution of counsel.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 150, quoting *State v. Evans*, 153 Ohio App.3d 226, 2003-Ohio-3475, 792 N.E.2d 757, ¶ 32 (7th Dist.). To the contrary, counsel " 'has a duty to

be candid' " and " 'to give the accused an honest appraisal of his case.' " *Id.* at ¶ 151, quoting *Brown v. United States*, 264 F.2d 363, 369 (D.C.Cir.1959). Here, defense counsel apparently gave McKelton their honest appraisal of his case, which does not prove bias or conspiracy.

{¶ 72} McKelton also claims that he lacked confidence in Howard and Cook because they failed to establish a relationship of trust, met with him only twice, and did not consult with him about the state's evidence. But the record suggests that he met with Goldberg more regularly. The fact that he may have had fewer personal interactions with Howard or Cook in the months preceding Goldberg's withdrawal does not justify the removal of court-appointed counsel simply because Goldberg later withdrew.

{¶ 73} Next, McKelton objects that Howard and Cook failed to hire the necessary experts to prepare his defense. The trial court approved funding for "an investigator and mitigation specialist, a mental health professional, if * * * appropriate, and a forensic expert, if * * * appropriate." Counsel apparently hired only an investigator. But that does not necessarily prove that counsel were unprepared. Until a few weeks before trial, McKelton was represented by three attorneys. And his investigator worked more than 100 hours on the case. Defense counsel's decision to hire additional experts was a matter of trial strategy, and McKelton cannot establish that the strategy was unreasonable on this record. *See State v. Keyes,* 6th Dist. Erie No. E-08-072, 2009-Ohio-6343, ¶ 28.

{¶ 74} Finally, McKelton says counsel should have been permitted to withdraw because they were afraid of him. But counsel's only expression of concern occurred during the hearing on the motion to withdraw, and only in response to the prosecutor's reference to threats made by McKelton. The prosecutor promptly clarified that McKelton had *not* threatened his counsel. Thus, fear did not require the substitution of counsel in this case.

{¶ 75} The trial court reasonably declined to discharge Howard and Cook.

**b. Continuances**

{¶ 76} McKelton argues that the trial court's denial of his continuance requests violated his constitutional rights and prejudiced his defense. To the extent that McKelton's argument implicates his constitutional right to the effective assistance of counsel, McKelton must meet the *Strickland* test, showing both that counsel's performance was deficient and that he suffered prejudice.

{¶ 77} First, McKelton says that the court should have granted a continuance on September 17, 2010, when Goldberg withdrew. The defense's continuance motion was predicated on the appointment of *new* defense counsel, who would need additional time to prepare for trial. A continuance was unnecessary because Howard and Cook remained as defense counsel and they had "known for a significant amount of time" that Goldberg was likely to withdraw. Two months before trial, defense counsel indicated that Richard Goldberg's representation of McKelton might create a conflict of interest. The judge had previously warned Howard and Cook that they would need to be ready to go to trial without Goldberg and, on September 17, he found that they were prepared to do so. Neither Howard nor Cook indicated that they needed additional time to prepare as a result of Goldberg's withdrawal. McKelton does not explain how any deficient performance resulted from Goldberg's withdrawal, undermining any claim under *Strickland*. Accordingly, we find no error in the trial court's denial of the continuance request on September 17.

{¶ 78} Second, McKelton says that the trial court should have granted a continuance to allow the defense to investigate and prepare to cross-examine the eight state witnesses who were disclosed shortly before trial began. The authors of Crim.R.16 made clear that routine continuances to allow further defense investigation of nondisclosed witnesses would destroy "the protective purpose of [the nondisclosure] process." 2010 Staff Notes, Crim.R. 16(F). For this reason,

the "[Rules] Commission anticipated that continuances of trial dates would occur only in limited circumstances." *Id.*

{¶ 79} McKelton generally asserts that more time would have aided his defense, but he does not explain why this case qualifies as one of those limited circumstances. The record does not indicate that defense counsel were unprepared for cross-examination; they cross-examined each of the late-disclosed witnesses who testified at trial and even used some statements—as provided by the state—to impeach them. And McKelton offers no indication of what information further investigation would have yielded or how counsel would have used that information. *See State v. Keith*, 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47 (1997) (claims that require evidence outside the record are not appropriately considered on direct appeal).

{¶ 80} Thus, McKelton has failed to establish an abuse of discretion or a violation of his constitutional rights.

{¶ 81} For these reasons, we reject proposition of law No. 1.

### 3. *Voir Dire: Proposition of Law No. 3*

{¶ 82} In his proposition of law No. 3, McKelton argues that the trial court violated his right to an impartial jury by denying his motion for individual, sequestered voir dire. He further claims that defense counsel did not have sufficient opportunity to question the venire.

{¶ 83} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993). However, because an adequate voir dire is "part of the guarantee of a defendant's right to an impartial jury," *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119, L.Ed.2d 492 (1992), that discretion is " 'subject to the essential demands of fairness,' " *id. at* 730, quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

### a. Group voir dire

{¶ 84} "There is no requirement that voir dire in a capital case must be conducted in sequestration." *State v. Fears*, 86 Ohio St.3d 329, 338, 715 N.E.2d 136 (1999). In *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, we held that a trial court did not err by denying a request for sequestered voir dire when the court "permit[ted] counsel to individually question prospective jurors" and also "gave all jurors the opportunity to be questioned in private if they were uncomfortable discussing their views in a group setting." *Id.* at ¶ 66.

{¶ 85} The trial court voir dired McKelton's prospective jurors in a group. But as in *Leonard*, the judge anticipated that the prospective jurors might not be comfortable answering every question in front of the entire group. At the outset of voir dire, he advised, "[I]f at any point during this process you wish to answer a question privately, you may do so." He reiterated this point just before allowing counsel to individually question the prospective jurors. Under these circumstances, we see nothing inherently unfair about the manner in which the trial court conducted voir dire.

{¶ 86} McKelton nevertheless claims that group voir dire was prejudicial because "[t]he entire venire was made aware of pretrial publicity." The trial judge asked whether "anybody here [] knows anything about this based upon publicity of the case." Five prospective jurors responded affirmatively, and three indicated some doubt about McKelton's innocence based on press coverage. The prosecutor explained to the venire that news reports are not evidence and that they are not always accurate. And no juror responded when these jurors were asked if they could not set aside anything they had read. In fact, defense counsel even described an error in a recent news account.

{¶ 87} McKelton argues that this line of questioning tainted the entire venire by informing every potential juror that some press coverage had implied his guilt. But an entire venire is not necessarily prejudiced due to "the effect of being

influenced by the opinions expressed by prior veniremen." *State v. Carter*, 72 Ohio St.3d 545, 555, 651 N.E.2d 965 (1995). We decline to presume that McKelton's entire jury pool was tainted simply because the prospective jurors learned that negative publicity existed. In addition, McKelton does not point to any evidence that the venire was *actually* prejudiced by the voir dire on publicity. Under these circumstances, there is no indication that any of the seated jurors were biased against McKelton.

{¶ 88} McKelton also objects to the prosecutor's questions about domestic violence during group voir dire. McKelton did not object to the prosecutor's questions, but he now says that they unfairly influenced the entire venire. In light of the pending domestic-violence charges, it was reasonable for the prosecutor to inquire about the prospective jurors' "history * * * with acts of domestic violence as a means of determining their ability to give fair consideration to the issues that would arise at trial." *State v. Collymore*, 8th Dist. Cuyahoga No. 81594, 2003-Ohio-3328, ¶ 65. We will not presume that an entire venire is prejudiced simply because the prospective jurors were exposed to the opinions of other veniremen. *Carter* at 555. And the record does not indicate that the discussion of domestic violence actually biased any of the jurors.

{¶ 89} For these reasons, we reject McKelton's argument that the trial court erred by denying his motion for individual voir dire.

### b. Insufficient opportunity for voir dire

{¶ 90} McKelton also argues that defense counsel did not have a sufficient opportunity to ensure the jurors' impartiality.

{¶ 91} First, he says that the jury questionnaire was inadequate. At a pretrial hearing, defense counsel requested a 12-page jury questionnaire, and the state requested its usual 2-page questionnaire. The trial judge agreed to produce a questionnaire "in between" the parties' proposals. In the end, the jury questionnaires did not address attitudes toward the death penalty.

{¶ 92} Trial courts have discretion to determine the content of jury questionnaires. *See State v. Davie*, 80 Ohio St.3d 311, 317, 686 N.E.2d 245 (1997). Here, McKelton cannot show that the trial court's decision to use its own questionnaire was unreasonable, arbitrary, or unconscionable. Moreover, McKelton has failed to establish that he was prejudiced by the omission of questions about attitudes toward the death penalty. He does not assert that any seated juror was predisposed to order a sentence of death.

{¶ 93} Second, McKelton claims his counsel did not have enough time to conduct voir dire. During a pretrial hearing, defense counsel warned that it might take two days to select a jury. The judge responded, "It will take whatever life and time it takes." On the morning that voir dire began, the trial judge told the venire, "[W]e believe we'll have a jury selected by the close of business today." Mid-afternoon, defense counsel thanked the prospective jurors and explained, "I know it's getting late, and I'm going to try to wrap this up, but I have a couple of other things that I want to talk about * * *." Later, after defense counsel asked his final question, he took a moment to review his notes, then thanked the judge and jurors for their patience. Defense counsel did not request more time, indicate that he felt rushed, or state a desire to ask additional questions. We see no reason to conclude that voir dire was unduly truncated.

{¶ 94} McKelton's third proposition of law is not well taken.

### B. Evidentiary Issues

#### 1. *Forfeiture by Wrongdoing: Proposition of Law No. 4*

{¶ 95} In proposition of law No. 4, McKelton argues that the trial court erred by admitting various hearsay statements by Missy Allen under the doctrine of forfeiture by wrongdoing. According to McKelton, this alleged error violated his rights to confrontation and due process.

{¶ 96} Forfeiture by wrongdoing has long been recognized as an equitable exception to a defendant's constitutional right to confront the witnesses against

him.  *See Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed.2d 244 (1878).  Ohio codified this doctrine in 2001 as a hearsay exception under Evid.R. 804(B)(6).  To admit statements under this exception, a prosecutor must show by a preponderance of the evidence that (1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify.  *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106; *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84.

{¶ 97} Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion.  *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).  However, we review de novo evidentiary rulings that implicate the Confrontation Clause.  *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010).

### a.  Factual background

{¶ 98} The prosecution filed notice of its intent to offer Allen's statements under Evid.R. 804(B)(6) in August 2010, but the trial court did not address the forfeiture question until the trial in October.

{¶ 99} Defense objected when the prosecutor asked his third witness, Sherrie Bluester, the children services' screener, what Allen had said about her broken ankle.  The prosecutor argued that Allen's statements were admissible under the forfeiture doctrine because he had established (1) Allen's unavailability and (2) that McKelton had acted with the purpose when he made her unavailable.  The trial judge overruled McKelton's objection.  The judge explained, "[T]he allegation in this case is that this defendant murdered the victim, Ms. Allen, and I think this is exactly what the forfeiture by wrongdoing exception is."  The defense noted a continuing objection on this basis.

{¶ 100} The next day, the court invited the parties to more fully articulate their positions on forfeiture by wrongdoing.  Defense counsel objected that the trial

court had not found that McKelton had made Allen unavailable with the *purpose* of preventing her appearance at a trial. But the prosecutor argued that it was proper to infer McKelton's purpose from his history of domestic violence against Allen. He cited Z.D.'s and T.W.'s "testimony about the pattern of abuse" and "the multiple incidents" that they had witnessed. He also noted T.W.'s testimony that McKelton had once snatched the phone from her after Allen had asked her to call the police. The state contended that this evidence showed, by a preponderance of the evidence, "that this relationship was in a dynamic of domestic violence, of a pattern of abuse designed to isolate her and keep her from reporting to outside help."

{¶ 101} Referring to his ruling from the previous day, the trial judge found that the state had met its burden, given "the totality of the evidence in this particular case." The judge stressed that the defense could still object to Allen's statements on other grounds.

### b. Admissibility under the Confrontation Clause

{¶ 102} McKelton claims that his confrontation rights were violated by the admission of dozens of Allen's statements through the testimony of her nieces, her friends, a physical therapist, a children's services screener, and a police officer.[2] He says that these statements were not admissible under the forfeiture-by-wrongdoing exception because the state did not establish that he had killed Allen with the purpose of preventing her from testifying against him.

{¶ 103} The United States Supreme Court has analyzed the forfeiture doctrine's common-law roots and concluded that it "applie[s] only when the defendant engaged in conduct *designed* to prevent the witness from testifying"

---

[2] To the extent McKelton objects to the admission of nontestimonial hearsay, he was not entitled to confront the declarants. *See Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). For example, he discusses Allen's statements to friends and relatives. But an unavailable witness's "[s]tatements to friends and neighbors about abuse and intimidation" do not implicate the confrontation clause. *Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).

about an earlier offense. (Emphasis sic.) *Giles*, 554 U.S. at 359, 128 S.Ct. 2678, 171 L.E.2d 488. Accordingly, "unconfronted testimony [will] *not* be admitted without a showing that the defendant intended to prevent [the] witness from testifying." (Emphasis sic.) *Id.* at 361. *Giles* does not require that this be a defendant's "sole or even primary purpose," however; it is sufficient if one purpose for the defendant's conduct was to make the victim unavailable, *State v. Supanchick*, 323 P.3d 231, 239 (Ore.2014); *see also Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 90 (interpreting Evid.R. 804(B)(6)).

## (1) Accident and purpose

{¶ 104} McKelton argues that the notion of "purpose" in forfeiture analysis is inconsistent with both the charges against him and the state's theory of Allen's murder.

{¶ 105} Because the state charged McKelton with the felony murder of Allen, R.C. 2903.02(B), predicated on an underlying offense of felonious assault, R.C. 2903.11(A)(1), the state had to prove only that he acted knowingly in committing the felonious assault, not purposely in killing Allen. *See Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 43 (felony murder requires proof of "the mens rea element set forth in the underlying felony offense").

{¶ 106} But mere knowledge does not satisfy the purpose prong of the forfeiture doctrine. *Giles* makes clear that the exception will not apply "in the typical murder case involving accusatorial statements by the victim" when the defendant has "caused a person to be absent" but did "not do[] so to prevent the person from testifying." 554 U.S. at 361, 128 S.Ct. 2678, 171 L.Ed.2d 488. Instead, it applies in a murder case only if the state proves that a defendant murdered the victim with the *purpose* of preventing the victim's testimony about a separate offense.

{¶ 107} The record does not indicate that McKelton had planned to kill Allen on July 28, 2008, let alone to do so for a particular reason. Indeed, the state's

theory was that Allen's murder "was spontaneous" and "wasn't planned." Witnesses testified that McKelton killed Allen during an argument and tried to revive her. Thus, the immediate circumstances of Allen's death do not establish the requisite purpose that would allow the admission of testimonial statements because of forfeiture by wrongdoing.

### (2) Domestic violence and purpose

{¶ 108} The immediate-circumstances analysis does not end the inquiry, however, because, as the state argues, the broader circumstances—the history of domestic violence between McKelton and Allen—support an inference of purpose in this case.

{¶ 109} In *Giles*, the Supreme Court expressly "left open the possibility that a defendant's intention to prevent testimony might be inferred from the surrounding circumstances, such as in a case of ongoing domestic violence." *Crawford v. Commonwealth*, 686 S.E.2d 557, 564 (Va.App.2009), *aff'd* 704 S.E.2d 107 (Va.2011).

{¶ 110} The court explained that "[a]cts of domestic violence" are relevant to the purpose inquiry because they "often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions." *Giles*, 554 U.S. at 377, 128 S.Ct. 2678, 171 L.Ed.2d 488. When an abusive relationship ends in murder, "the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine." *Id.* Hence, in deciding whether the forfeiture exception applies, courts should regard as "highly relevant" any evidence of past abuse (or threats) designed to discourage a victim from seeking outside help, as well as evidence of ongoing criminal proceedings where the victim was expected to testify. *Id.*

{¶ 111} Evidence of domestic violence is "highly relevant" to analyzing the purpose prong of the forfeiture exception. *Giles* at 377; *see also*, *e.g.*, *State v. McLaughlin*, 265 S.W.3d 257, 272 (Mo.2008); *People v. Banos*, 178 Cal.App.4th 483, 491-492, 100 Cal.Rptr.3d 476 (2009).

{¶ 112} McKelton argues that there is insufficient evidence of domestic violence in this case. The record does not indicate that Allen ever reported domestic abuse to police or that she was expected to testify against McKelton in a pending criminal proceeding when she died. *Cf. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 108-109; *McLaughlin* at 272.

{¶ 113} Even so, purpose can be inferred from the evidence in this case. Allen's nieces, who lived with McKelton and Allen, both testified about McKelton's abuse of Allen. And T.W. specifically testified that McKelton took the phone away from her when Allen asked her to call 9-1-1. When Z.D. *did* call 9-1-1 on the night that Allen broke her ankle, McKelton was enraged. Thus, although Allen had not formally contacted police, her nieces' testimony indicates that McKelton was trying to isolate Allen and prevent her from talking to authorities.

{¶ 114} For these reasons, the admission of Allen's statements did not violate *Giles*'s purpose requirement and we reject proposition of law No. 4.

### 2. Impeachment of Gerald Wilson: Proposition of Law No. 6

{¶ 115} In proposition of law No. 6, McKelton argues that the trial court erred by permitting the state to impeach its own witness, Gerald Wilson, with his prior inconsistent statement and by admitting extrinsic evidence of that prior statement. McKelton also argues that the prosecutor improperly relied on Wilson's prior statement as substantive evidence of his guilt.

### a. Factual background

{¶ 116} Wilson gave a police statement in January 2009 in which he said that he had heard McKelton admit to choking Allen. McKelton also threatened that if Wilson said anything, he would "end up like Mick did."

{¶ 117} When the state called Wilson to testify, he denied or claimed not to recall having made the statements. When pressed, he broadly asserted that he did not know anything about the matter. Finally, he admitted that he had spoken to police, but then claimed that police had falsified the transcript of his statement. He insisted that he had been lying and that police were telling everyone to lie about McKelton. Over defense objection, the state played an audio recording of Wilson's police interview.

{¶ 118} After Wilson left the stand, the prosecutor asserted that he had been "shocked and surprised" by his recantation. The prosecutor stated that he had personally interviewed Wilson and that his representations had been consistent with his police statement. The trial judge found that "there were surprises and affirmative damage," which allowed the state to impeach Wilson under Evid.R. 607. The next day, the state sought to admit Wilson's statement as an exhibit. The trial court sustained a defense objection.

**b. Application of Evid.R. 607(A)**

{¶ 119} Evid.R. 607(A) authorizes a party to impeach its own witness "by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." We review a trial court's application of this rule for an abuse of discretion. *Davie*, 80 Ohio St.3d at 323, 686 N.E.2d 245.

{¶ 120} "Surprise" occurs when a witness's testimony materially differs from a prior statement and counsel had no reason to believe that the witness would testify as he did at trial. *See id.*; *Ferguson Realtors v. Butts*, 37 Ohio App.3d 30, 33, 523 N.E.2d 534 (12th Dist.1987); *State v. Blair*, 34 Ohio App.3d 6, 9, 516 N.E.2d 240 (8th Dist.1986). Here, the prosecutor said he was "shocked and surprised" when Wilson's trial testimony materially differed from his statement to police. Under these circumstances, the trial court reasonably found that the state was surprised by the witness's testimony.

{¶ 121} The "affirmative damage" requirement is satisfied if a "party's own witness testifies to facts that contradict, deny, or harm that party's trial position." *Blair* at 9; *see also Ferguson Realtors* at 33. Wilson said that police had asked him—and other witnesses—to lie. This potentially undermined the testimony of several crucial state witnesses who had testified that they had heard McKelton confess to one or both murders. Given that the prosecutor did not have any eyewitnesses, the trial court reasonably found that Wilson's testimony affirmatively damaged the state's case.

{¶ 122} McKelton also objects that the state did not establish surprise and affirmative damage *before* impeaching Wilson. The defense did not object to the state's examination of Wilson until the state announced that it would like to play a recording of his January statement. At that time, the trial court invoked Evid.R. 607(A) to overrule the defense objection and allowed the state to play the recording. On this record, we hold that the requirements of Evid.R. 607 were satisfied.

{¶ 123} Furthermore, McKelton cannot demonstrate any plain error in the state's questioning of Wilson before the defense objected at trial. *See State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The state's questions laid the necessary foundation for introducing extrinsic evidence of Wilson's prior statement under Evid.R. 613. And these questions did not alter the outcome of McKelton's trial.

{¶ 124} In short, the trial court did not abuse its discretion by allowing the prosecutor to impeach Wilson with his prior inconsistent statement.

### c. Extrinsic evidence of Wilson's prior statement

{¶ 125} McKelton also claims that by permitting the state to play an audio recording of Wilson's prior statement, the trial court contravened *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996), which prohibits reading a witness's prior statement to the jury. But *Ballew* involved only the reading of a prior statement to refresh a witness's recollection under Evid.R. 612. *Id.* at 254. By contrast, Evid.R.

613 specifically contemplates the admission of extrinsic evidence of a prior statement under the circumstances outlined in Evid.R. 613(B). Ohio courts have regularly applied the rule to admit a witness's prior inconsistent statement for impeachment purposes. *See, e.g., State v. Fisher*, 8th Dist. Cuyahoga No. 83098, 2004-Ohio-3123, ¶ 14; *State v. Schaffer*, 114 Ohio App.3d 97, 102, 682 N.E.2d 1040 (3d Dist.1996).

**{¶ 126}** McKelton does not dispute that the state satisfied the requirements of Evid.R. 613. The state laid the proper foundation before playing the recording, and the contents of Wilson's statement went to a fact of consequence to the action: his testimony presented a conflict with his prior statement about whether McKelton had confessed or police were manufacturing a case against him. Thus, the trial court did not abuse its discretion by permitting the state to play the recording for the jury.

#### d. Wilson's statement as evidence of McKelton's guilt

**{¶ 127}** Finally, McKelton argues that the state improperly relied on Wilson's prior statement as substantive evidence of McKelton's guilt. As a result, he asserts that there is a "grave risk" that he was convicted based on unsworn testimony, in violation of the Fifth, Sixth, and Fourteenth Amendments.

**{¶ 128}** As a general rule, "prior inconsistent statements constitute hearsay evidence and thus are admissible only for the purpose of impeachment." 1 Gianelli, *Evidence*, Section 607.4, at 482-483 (3d Ed.2010); *see also id.*, Section 613.3, at 591. Accordingly, unless another hearsay exception applies, a party may not interrogate his own witness about a prior inconsistent statement " 'for the purpose of offering substantive evidence against the accused.' " *State v. Dick*, 27 Ohio St.2d 162, 165, 271 N.E.2d 797 (1971), quoting *State v. Duffy*, 134 Ohio St. 16, 15 N.E.2d 535 (1938), paragraph two of the syllabus. Further, the prosecutor must not refer to such statements for their truth during closing argument. *State v. Richcreek*, 196

Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 54 (6th Dist.), quoting *State v. Kirk*, 6th Dist. Huron No. H-09-006, 2010-Ohio-2006, ¶ 28.

{¶ 129} During closing argument, the prosecutor did cite Wilson's prior inconsistent statement as substantive evidence of McKelton's guilt. But because McKelton did not request a limiting instruction or otherwise object, plain-error review applies. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 91.

{¶ 130} Given the state's reliance on Wilson's prior statement as substantive evidence and the lack of a limiting instruction, the jury may have considered the unsworn testimony in support of its conviction of McKelton. But the error was not outcome-determinative, because Wilson was not the only person to hear McKelton confess to the murder of Allen or Evans. Sheridan Evans, Marcus Sneed, and Charles Bryant all testified that he had implicated himself in Allen's death. And Sneed, Bryant, and Lemuel Johnson all testified that McKelton implicated himself in Evans's death.

{¶ 131} For these reasons, we reject proposition of law No. 6.

### 3. *Testimony of Crystal Evans: Proposition of Law Nos. 10 and 11*

{¶ 132} The prosecutor questioned Crystal about her March 2, 2009 police statement and about some of her phone calls and correspondence with McKelton during the months before trial. The trial court admitted a complete transcript of the police interview, recordings of the phone calls, and the letters into evidence. In proposition of law No. 10, McKelton argues that this violated his right to a fair trial, due process, a reliable determination of guilt, and a reliable sentence. He also contends, in proposition of law No. 11, that it was improper to admit statements that had been made by detectives during the interview.

{¶ 133} McKelton did not request limiting instructions or object at trial, so plain-error review applies. *See Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

### a. Impeachment of Crystal

{¶ 134} McKelton argues that it was improper to rely on Crystal's prior statement to impeach her testimony on direct examination. The state counters that its use was proper to demonstrate McKelton's "prior planning to escape criminal liability for Germaine Evans's death."

{¶ 135} Prosecutors may elicit testimony on direct examination that the defendant asked a witness "to fabricate an alibi for him," *Commonwealth v. Young*, 561 Pa. 34, 61-62, 748 A.2d 166 (2000), because such evidence "strongly indicates consciousness of guilt." *State v. Campbell*, 69 Ohio St.3d 38, 47, 630 N.E.2d 339 (1994). Although the state did not elicit such testimony here, it did have a reasonable basis for probing Crystal to determine whether her inconsistencies were a product of McKelton's coaching; a letter and a jailhouse phone call suggested that he had coached her about an alibi. And because Crystal provided McKelton's alibi, the state was entitled to question her about the timing of McKelton's and her own movements on February 27, 2009.

### b. Extrinsic evidence of Crystal's statements to police

{¶ 136} McKelton also argues that there was no evidentiary basis for the trial court to admit extrinsic evidence of Crystal's March statements to police.

{¶ 137} Crystal's prior out-of-court statement would generally be inadmissible for the truth of the matter asserted. Evid.R. 801(C) and 802. The state contends that her statements are nonhearsay because they indicate consciousness of guilt by confirming that McKelton encouraged her to provide a false alibi. But nothing in Crystal's statements, or in her responses to inquiries about them at trial, indicates that McKelton had asked her to lie. Therefore, the state has not identified a legitimate nonhearsay purpose.

{¶ 138} The state has not identified any other hearsay exemption or exception that would apply to Crystal's statements. They were not admissible as prior inconsistent statements under Evid.R. 607(A), so extrinsic evidence of them

does not fall under Evid.R. 613(B). And although the state used Crystal's earlier statements to refresh her recollection, that entitled the defense—not the state—to admit the transcript of her statements. *See* Evid.R. 612. As a result, the trial court erred by admitting Crystal's statements.[3]

{¶ 139} Even so, McKelton cannot establish that but for this error, the outcome of the trial "clearly would have been otherwise." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69. Ultimately, McKelton's whereabouts on the night of Evans's murder were not crucial because the state advanced the theory throughout the trial that he had enlisted someone else to kill Evans. Indeed, in his own brief, McKelton concedes that "[w]hether [he] was at [Crystal's] apartment on the night of Germaine's death is insignificant." Thus, the error did not affect McKelton's substantial rights. *See* Crim.R. 52(B).

### c. Police statements during Crystal's interview

{¶ 140} McKelton also objects to the admission of the transcript of Crystal's police interview because it included inadmissible hearsay statements made by Detectives Luke and Witherell. During the interview, the detectives told Crystal that McKelton had abused Allen, severely beat the mothers of his daughters, and abused other women. They also indicated that they had evidence that Evans was in a car with McKelton around 9:00 p.m. on the night he died. And they tried to undermine Crystal's claim that McKelton had been with her the entire night of Evans's murder, stating that Crystal had told her mother otherwise.

{¶ 141} The state argues that these statements were admissible because they were "actually questions, designed to elicit a response from Crystal Evans." But here the detectives' "questions" incorporated numerous assertions about McKelton. And the state does not argue that they were admissible solely for a nonhearsay purpose, such as providing context for Crystal's responses. *Cf. State v. Keene*, 9th

---

[3] In light of this conclusion, we need not separately analyze McKelton's claim that this evidence violated Evid.R. 403.

Dist. Lorain No. 06CA8880, 2006-Ohio-6676, ¶ 24 (holding that "the State did not introduce the questions posed by the officer for the truth contained in those statements" when the state had "asserted that the statements were necessarily included to give context to the answers given by appellant").

**{¶ 142}** Because the transcript "was admitted for all purposes, including the truth of the matter stated, the detective[s'] statements were also hearsay." *Lampkins v. State*, 778 N.E.2d 1248, 1251-1252 (Ind.2002). The jurors had no way to know that the "statements were not evidence" or that the officers' representations to Crystal may not have been entirely truthful. *Id.* at 1252; *see also State v. Craycraft*, 147 Ohio Misc.2d 5, 2008-Ohio-2192, 889 N.E.2d 1110, ¶ 22 (Clermont C.P.). "It [was] error to admit statements by an interrogating officer without any limiting instruction or admonishment." *Lampkins* at 1252.[4]

**{¶ 143}** Even so, McKelton cannot establish that the error affected his substantial rights. The jury heard independent evidence of the detectives' assertions at trial, with the exception of Luke's statement that McKelton had abused other women. And even that statement was not outcome-determinative in light of the ample additional evidence supporting McKelton's convictions.

### d. Admission of recordings and letters

**{¶ 144}** McKelton also claims that the trial court violated Evid.R. 403 by admitting recordings of his jailhouse phone calls with Crystal and his letters to her. All relevant evidence is admissible, Evid.R. 402, unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, Evid.R. 403(A).[5]

---

[4] These statements do not raise confrontation concerns because Luke and Witherell both testified during the state's case-in-chief. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn.9.

[5] McKelton repeatedly asserts that "heightened scrutiny" applies to Evid.R. 403 objections in capital cases. But the case he cites for this proposition establishes a more exacting standard for the

**{¶ 145}** In the recording of the first call admitted, McKelton explained the police's theory of Evans's murder and asked Crystal why she had left police a voicemail suggesting that he arrived home *after* 10 p.m. on February 27. In the second call, he and Crystal argued loudly, and he scolded, "I wonder why you making these stupid decisions." These conversations are highly probative of McKelton's efforts to establish an alibi and to monitor Crystal's exchanges with police, and their probative value is not substantially outweighed by the danger of unfair prejudice.

**{¶ 146}** The content of the letters was also more probative than unfairly prejudicial. The four letters introduced during Crystal's testimony supported the state's theory that McKelton was trying to persuade her to lie for him at trial. In one, he proposes to Crystal and discusses his plans to marry her. In another, he teaches her a secret code and discusses his desire for a venue change due to publicity. In yet another, he says he wants to drum up media attention and suggests publicly posting witness names, arguably as a scare tactic. And in the last, he notes that he has reviewed evidence that Evans died at 10:00 p.m. and reminds Crystal that they were "home asleep at ten." The trial court did not err by admitting this evidence.

**{¶ 147}** For these reasons, we reject proposition of law No. 10.

### 4. Audrey Dumas as a Witness Identified with an Adverse Party:
### Proposition of Law No. 7

**{¶ 148}** In proposition of law No. 7, McKelton argues that his due-process rights were violated when the trial court allowed the state to treat Audrey Dumas as a witness identified with an adverse party and permitted excessive, leading questions.

---

admission of gruesome photographs in capital cases, not for the admission of all evidence in capital cases. *See State v. Morales*, 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267 (1987). This court has declined to extend *Morales* beyond the context of gruesome photographs. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 130.

### a. Factual background

{¶ 149} Before Dumas began testifying, the state sought leave to use leading questions under Evid.R. 611(C) because she was "identified with the adverse party in this case." After requiring the state to establish Dumas's relationship with McKelton, the trial court granted the state's request.

### b. Determination that Dumas was identified with an adverse party

{¶ 150} Evid.R. 611(C) generally prohibits the use of leading questions on direct examination. However, they are permitted "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." *Id.* We review a trial court's application of this rule for an abuse of discretion. *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 111, 592 N.E.2d 828 (1992).

{¶ 151} Here, the record supports the trial court's finding that Dumas was identified with McKelton. Dumas testified that they had ended a six-year romantic relationship earlier that year, and they were still close. She visited McKelton in jail, sent him money, exchanged letters with him, and spoke to him on the telephone. Indeed, she had even spoken with him since his trial began four days earlier.

{¶ 152} McKelton argues that even if his relationship to Dumas was sufficient to establish that she was identified with him, to establish adversity, the prosecutor also had to show that Dumas was evasive. But evasiveness is not a prerequisite to finding adversity. Instead, it is generally relevant to assessing whether a witness is hostile, an entirely separate basis for permitting leading questions under Evid.R. 611(C). *See Weissenberger*, Ohio Evidence: 1991 Courtroom Manual (1991) 170 ("A hostile witness is one who is so evasive or uncooperative on examination that his testimony is impeded").

{¶ 153} Thus, the trial court reasonably found that Dumas was a witness identified with an adverse party.

### c. The state's questions

**{¶ 154}** McKelton alternatively argues that the state "used excessive leading questions to improperly put words in [Dumas's] mouth and place improper insinuations before the jury."[6] Because McKelton did not raise this objection at trial, we review for plain error.

**{¶ 155}** On direct examination, the prosecutor inquired about the following: (1) whether Dumas had given McKelton money in the past and whether she had set up robbery victims for him, (2) her date with McKelton on the evening of Allen's death, (3) her interaction with McKelton after Allen's body was found, and (4) McKelton's request that she speak to his attorney about his alibi a few weeks after Allen's death. Throughout the questioning, the prosecutor expressed disbelief that Dumas had never asked McKelton whether he killed Allen. He also tried to establish that Dumas had, at McKelton's request, texted and called McKelton on the night of Evans's murder to establish an alibi for him.

**{¶ 156}** McKelton first claims that the prosecutor used "excessive" leading questions. But a party is permitted to ask leading questions under Evid.R. 611(C), and there is no limit on the *number* of leading questions the party may ask.

**{¶ 157}** Second, although McKelton claims that the prosecutor "improperly put words in Dumas'[s] mouth," Dumas often refused to answer questions with a simple "yes" or "no."

**{¶ 158}** Third, McKelton claims that the questions amounted to "improper insinuations." "Prosecutors must avoid insinuations and assertions calculated to mislead. * * * [T]hey may not allude to matters not supported by admissible evidence." *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). Although the state's questions did imply that the alibis were not credible and the prosecutor

---

[6] McKelton also asserts that "the State used Dumas" to present "highly inflammatory evidence that should have been excluded under Evid.R. 403(A)." But he does not identify the evidence he deems inflammatory and thus has not meaningfully presented this claim for review.

argued in closing that McKelton asked Dumas to provide an alibi for both nights, there is no indication that these questions were calculated to mislead the jury or were unsupported by a factual predicate.

{¶ 159} We reject proposition of law No. 7.

### 5. Domestic-Violence Expert: Proposition of Law No. 14

{¶ 160} In proposition of law No. 14, McKelton argues that the state's expert testimony about domestic violence was inadmissible because the defense had not challenged the credibility of the victim. He further argues that the expert impermissibly testified about Allen's specific characteristics rather than about characteristics of domestic-violence victims generally.

{¶ 161} Expert-witness testimony is generally admissible "if it will assist the trier of fact in search of the truth." *State v. Koss*, 49 Ohio St.3d 213, 216, 551 N.E.2d 970 (1990). Evid.R. 702 permits a witness to testify as an expert if (1) the "testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons," (2) the witness "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony," and (3) the "testimony is based on reliable scientific, technical, or other specialized information." We review a trial court's admission of expert testimony for an abuse of discretion. *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50. Although Allen was deceased, the state presented a theory that domestic abuse had occurred even though Allen had not reported it. This expert testimony met the *Koss* test of assisting the trier of fact to determine a material issue.

{¶ 162} Over repeated objections, Margene Robinson, a retired police lieutenant who had supervised the Domestic Violence Unit in the Dayton Police Department, testified as a domestic-violence expert during the state's case-in-chief. She described the three phases of a cycle of domestic violence: (1) the tension-building phase, when economic or domestic issues arise or the abuser makes

accusations, (2) the battering phase, when the perpetrator engages in verbal, sexual, or physical abuse, and (3) the honeymoon phase, when the abuser expresses remorse and may promise to change. She added that after the third phase, the cycle begins again. Domestic violence is about asserting "power over the victim * * * and control," and many victims are reluctant to leave an abusive relationship because of religious beliefs, shame, or fears of retaliation, she testified.

{¶ 163} McKelton argues that Robinson exceeded the established limits for expert testimony about domestic violence. This court has affirmed the use of expert testimony about battered-women's syndrome, but only if " 'there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that a jury would be aided by expert testimony providing an explanation for the behavior.' "[7] *Id.* at ¶ 46, quoting *State v. Borrelli*, 227 Conn. 153, 172, 629 A.2d 1105 (Conn.1993), fn. 15.

{¶ 164} The state offered Robinson's testimony about the cycle of domestic violence to explain how Allen's failure to report McKelton could be consistent with other evidence of abuse. And the state established an adequate foundation for this testimony by presenting evidence that McKelton and Allen were in a cycle of domestic violence. *See Haines,* 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, at ¶ 48 ("Evidence generally establishing the cycles of a battering relationship is an appropriate foundation for battered-woman-syndrome expert testimony"). Thus, Robinson's testimony was both relevant and predicated upon a proper foundation.

{¶ 165} Regarding McKelton's assertion that Robinson improperly testified about Allen's specific characteristics, we note that although Robinson indicated some familiarity with Allen's background, she did not opine that Allen was a

---

[7] Experts often use the term "battered woman syndrome" to refer to "both the psychological effects of domestic violence and the dynamics of abusive relationships." Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L.Rev. 1191, 1195 (1993), fn. 14.

victim. Her testimony about women bearing certain characteristics dispelled a common misperception—echoed in McKelton's own brief to this court—that there is a "stereotypical victim of domestic violence." Through Robinson, the state established that domestic violence can affect unlikely victims.

{¶ 166} Finally, McKelton argues that Robinson's testimony violated Evid.R. 403 because it was tainted by her knowledge of the facts in this case. Robinson testified that before trial, she had reviewed some of Allen's writings and a letter to Allen from McKelton. McKelton reasons that Robinson's reference to these materials implied that Robinson "was called because the materials' contents revealed incidents of domestic violence."

{¶ 167} Robinson did not need to review this information—or to mention it at trial—in order to testify generally about domestic violence. But the record in no way suggests that these materials affected her testimony; she testified that her knowledge was derived from domestic-violence literature and her own experience. Ideally, the trial court should have instructed the jury on the limits of Robinson's testimony to eliminate any possible confusion, *see Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, at ¶ 57, but even so, we cannot conclude that the trial court abused its discretion by denying McKelton's motion "to strike *all* of her testimony." (Emphasis added.)

{¶ 168} For these reasons, we reject proposition of law No. 14.

### 6. Cross-Examination of Informants: Proposition of Law No. 9

{¶ 169} In proposition of law No. 9, McKelton claims that the trial court improperly limited his cross-examination of three incarcerated informants: Charles Bryant, Lemuel Johnson, and Marcus Sneed. McKelton says that the jury was "not able to thoroughly judge [their] credibility" because he did not get to adequately question them about their motives for testifying about his statements implicating himself in the murders of Allen and Evans.

### a. Scope of the right to cross-examine a witness

{¶ 170} The Sixth Amendment to the U.S. Constitution gives a defendant the right "to be confronted with the witnesses against him." *See also* Ohio Constitution, Article I, Section 10[8] ("the party accused shall be allowed * * * to meet the witnesses face to face"). But this protection "guarantees only 'an *opportunity* for effective cross-examination.' " (Emphasis in original.) *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Trial courts have "wide latitude * * * to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

{¶ 171} Similarly, Evid.R. 611(B) requires trial courts to permit "[c]ross-examination * * * on all relevant matters and matters affecting credibility." However, under Evid.R. 611(A), a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence."

{¶ 172} When a defendant challenges a trial court's limitation on cross-examination on appeal, the standard of review turns on the nature of the limitation. "Limitations * * * that deny a defendant 'the opportunity to *establish* that the witnesses may have had a motive to lie' infringe on core Sixth Amendment rights" and are reviewed de novo. (Emphasis sic.) *State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, ¶ 45 (1st Dist.), quoting *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir.1994). To establish a confrontation violation, then, McKelton must show that he was "prohibited from engaging in otherwise appropriate cross-examination." *Van Arsdall* at 680. But if a trial court "allow[ed]

---

[8] "Section 10, Article I provides no greater right of confrontation than the Sixth Amendment * * *." *State v. Self,* 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990).

cross-examination to expose a motive to lie," then "it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Nelson* at 708. Under those circumstances, the extent of cross-examination is within the sound discretion of the trial court. *State v. Freeman*, 7th Dist. Jefferson No. 07JE5, 2008-Ohio-2925, ¶ 12, citing *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). To prove a violation of Evid.R. 611, McKelton must demonstrate that the trial court's limitation on cross-examination was "unreasonable, arbitrary or unconscionable." *Freeman* at ¶ 12.

### b. Charles Bryant

**{¶ 173}** On direct examination, Bryant stated that he was willing to cooperate with police out of self-interest, but he denied that he had been promised anything specific. On cross-examination, the defense established that Bryant had a prior felonious-assault conviction and had been awaiting trial for felonious assault and other offenses for 14 months. He admitted that his trial had been continued "[r]oughly maybe four times" but denied that it had been continued "to see how [his] testimony goes in [McKelton's] case." His attorney had advised him, however, that testifying against McKelton might help Bryant in his case.

**{¶ 174}** The trial court sustained objections to two defense questions: how many times Bryant's pending case had been set for trial and whether he had been charged with trafficking. *See Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431, 89 L.Ed.2d 674. The jurors already knew that Bryant was awaiting trial on felony offenses and that his trial had been continued until after he testified in McKelton's case, which "adequately established [his] motive to lie." *State v. Reed*, 10th Dist. Franklin No. 09AP-84, 2009-Ohio-6900, ¶ 11. The trial court did not violate McKelton's confrontation rights or Ohio's evidentiary rules by sustaining objections to these questions.

### c. Lemuel Johnson

{¶ 175} Johnson testified that he had been incarcerated on a federal cocaine-possession charge for about a year and would be sentenced about a month after McKelton's trial. But Johnson insisted that he did not expect his testimony against McKelton to help him at sentencing. He explained that he had not told police about his conversations with McKelton until he was locked up on this charge because he had assumed that "everybody in Cincinnati knew" already. He also told the jury about his prior convictions.

{¶ 176} On cross-examination, the trial judge sustained an objection to questioning as asked and answered when defense counsel repeatedly questioned Johnson about why Johnson thought his testimony would matter now. The jury had ample information to evaluate Johnson's motives to testify; it had been told that he was incarcerated and would soon be sentenced. *See Tansley*, 986 F.2d at 886; *Reed*, 2009-Ohio-6900, at ¶ 11. Repetition would have given the jury no greater information from which to form a different impression of his credibility.

### d. Marcus Sneed

{¶ 177} Sneed did not speak to police until he was jailed on federal conspiracy charges. He said that McKelton's admissions had long weighed on his conscience, but that he had been too worried for his family's safety to say anything until McKelton was locked up.

{¶ 178} Sneed had been in federal custody for 13 or 14 months on a drug-conspiracy charge at the time of McKelton's trial. He expressed uncertainty about whether he was facing a lengthy sentence, but admitted that he was being held without bond and had prior convictions in Ohio. He also admitted that his sentencing had been continued until after he testified at McKelton's trial, but said he did not know why. He insisted that he was not testifying with an eye to his upcoming sentencing hearing.

{¶ 179} The trial court sustained objections when defense counsel repeatedly questioned Sneed about the timing of his continuance, even after Sneed had answered. The trial court also sustained objections to inquiry into how many counts Sneed was facing and privileged attorney-client communications. The jury had sufficient information to evaluate Sneed's credibility, however. *See Reed*, 2009-Ohio-6900, at ¶ 11; *Tansley*, 986 F.2d at 886. Thus, cross-examination was not improperly curtailed.

{¶ 180} For these reasons, we reject proposition of law No. 9.

### 7. *Other Hearsay and Confrontation Challenges: Proposition of Law No. 11*

{¶ 181} In proposition of law No. 11, McKelton argues that the admission of hearsay evidence violated the Rules of Evidence and the Confrontation Clause. We will not reverse a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice. *See State v. Belton*, __ Ohio St.3d __, 2016-Ohio-1581, __ N.E.3d ¶ 116.

### a. "He choked her mother with a phone cord"

{¶ 182} Over objection, the prosecutor played a recording of a May 4, 2008 conversation between Z.D., Allen's niece, and a 9-1-1 dispatcher. On the recording, Z.D. related a statement by an out-of-court declarant, McKelton's daughter, who had "warned [her] about [McKelton], 'cause she said that he choked her mother with a phone cord."

{¶ 183} The statement by McKelton's daughter is hearsay within hearsay, which "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in the [Ohio Rules of Evidence]." Evid.R. 805. Z.D.'s out-of-court statements on the 9-1-1 recording were admissible under the excited-utterance or state-of-mind hearsay exceptions. *See* Evid.R. 803(2) and (3). But the record does not indicate that McKelton's daughter described the phone-cord incident to Z.D. while "under the stress of excitement caused by the event." Evid.R. 803(2). Nor does it show that

the statement went to McKelton's daughter's "then existing state of mind, emotion, [or] sensation" about the incident. Evid.R. 803(3); 1980 Staff Notes, Evid.R. 803(3) (state-of-mind exception "does not include statements of belief of past events" because doing so "would negate the entire proscription against hearsay evidence"). The state has not identified any other hearsay exception that would permit this statement, and this evidence should have been excluded.[9]

{¶ 184} Even so, McKelton was not materially prejudiced by the error. *Belton*, __ Ohio St.3d __, 2016-Ohio-1581, __ N.E.3d ___, at ¶ 116. The trial judge here expressly admonished the jurors not to consider *anything* in the 9-1-1 tape for its truth; they were permitted to consider the recording only as evidence of Z.D.'s "emotions and state of mind at the time" she called 9-1-1. This instruction significantly minimized any potential harm to McKelton. In addition, the jury heard far more prejudicial evidence from other witnesses that McKelton had choked women, specifically Allen, in the past. Under these circumstances, the error in admitting the phone-cord statement was harmless beyond a reasonable doubt. *See* Crim.R. 52(A); *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 28-29.

{¶ 185} McKelton also cannot establish a confrontation-clause violation. Only testimonial hearsay implicates the Confrontation Clause. *Davis*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224. "[T]estimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). But "[s]tatements to friends and neighbors about abuse and intimidation" are nontestimonial. *Giles*, 554 U.S. at 376, 128 S.Ct. 2678, 171

---

[9] Given this conclusion, we need not consider McKelton's alternative arguments that the statement violated Evid.R. 403 or 404.

L.Ed.2d 488. Here, the statement from McKelton's daughter to Z.D. was nontestimonial, and therefore no Sixth Amendment violation occurred.

### b. Hearsay to describe a subsequent investigative step

**{¶ 186}** Two detectives related hearsay, over objection, while testifying about their investigations of Allen's murder. A law-enforcement officer can testify about a declarant's out-of-court statement for the nonhearsay purpose of explaining the next investigative step. *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). Testimony offered to explain police conduct is admissible as nonhearsay only if it satisfies three criteria: (1) "the conduct to be explained [is] relevant, equivocal, and contemporaneous with the statements," (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) "the statements cannot connect the accused with the crime charged." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27. If testimony qualifies as nonhearsay, it does not implicate the Confrontation Clause. *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).

**{¶ 187}** Detective Witherell testified that during the Evans investigation, he was told that on the night he disappeared, Evans got into a car with Donte Terry in downtown Cincinnati. As a result, Witherell interviewed Terry and obtained his DNA sample. The rumor was not inadmissible hearsay because the state did not offer the statement for its truth. Witherell related the rumor only to explain how his investigation progressed (and why police had tested Terry's DNA). *See Ricks* at ¶ 27; *Thomas* at 232. The trial judge instructed the jury not to rely on the rumor for its truth. And contrary to McKelton's assertions, the prejudicial impact of this evidence did not outweigh its probative value. Evid.R. 403.

**{¶ 188}** Detective Luke explained why she began to look for Evans in connection with the investigation of Allen's death. She stated that she had gotten a new lead on Evans in February 2009. Before Luke described what she heard, the

trial court emphasized to the jurors that they should not take her testimony for its truth and that it was being offered only to explain her state of mind. Luke then testified that she had heard that Evans "was present during Missy's homicide, that he knew about it and that he was scared and that he may have either helped move the body or that he was present in the house when Missy was killed." This information prompted Luke to call Crystal in an effort to locate Evans.

{¶ 189} Luke's testimony violated *Ricks* because it went beyond the nonhearsay purpose of explaining why she was trying to locate Evans; her testimony also supported the state's theory that McKelton killed Evans because he had witnessed Allen's murder. Viewed for its truth, Luke's statement connected the two deaths. As a result, McKelton was entitled to confront the informant who gave Luke the information.

{¶ 190} Even so, the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also State v. Jordan*, 9th Dist. Summit No. 27005, 2014-Ohio-2857, ¶ 8-11 (evidence violated *Ricks*, but error was harmless beyond a reasonable doubt). The trial judge instructed the jurors not to consider this part of Luke's testimony for its truth, and we presume that they followed the instruction. *See State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). Moreover, viewed alongside the state's other evidence against McKelton, we do not see a " 'reasonable possibility that the evidence * * * might have contributed to the conviction.' " *Chapman* at 24, quoting *Fahy v. Connecticut*, 375 U.S. 85, 86, 84 S.Ct.229, 11 L.Ed.2d 171.

### c. Statements by spectators at Inwood Park

{¶ 191} Detective Karaguleff testified about statements he heard at Inwood Park when the police were investigating the discovery of a body, later identified as Evans. He said that Evans's mother and family members, who insisted that the victim was Evans, "believed that he was killed by his friend, Calvin McKelton * * * because he helped move that lawyer's body." According to Karaguleff, the

spectators made these statements in an "emotional" state; "[s]ome were crying," and they were "yelling, screaming, wailing." Because McKelton did not raise hearsay and confrontation-clause objections at trial, he has waived all but plain error. *See Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

{¶ 192} It is unclear whether these statements were admissible under the excited-utterance exception in Evid.R. 803(2) or whether they violated McKelton's confrontation rights, because the record does not indicate whether the bystanders spoke spontaneously, provided this information in response to police questioning, or even had any firsthand knowledge regarding the location or identity of the body, let alone the cause of death. But even assuming that a confrontation-clause violation occurred, the error was harmless because "the probable impact" of the statements "on the minds of an average jury" was negligible. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The jurors heard other witnesses testify that McKelton had admitted killing Evans because he had witnessed Allen's murder. Thus, "there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction," and so the alleged confrontation error was harmless beyond a reasonable doubt. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). For the same reason, the admission of these statements did not rise to the level of plain error.

{¶ 193} Proposition of law No. 11 fails.

### 8. Irrelevant and Prejudicial Evidence: Proposition of Law No. 5

{¶ 194} In his fifth proposition of law, McKelton argues that the state violated his constitutional rights by introducing numerous pieces of irrelevant and prejudicial evidence, as well as character evidence, at trial, in violation of Evid.R. 403 and 404. Unless otherwise noted, McKelton did not object to this evidence at trial, so we review his claims for plain error. *See Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

### a. Photographs of McKelton's tattoos

{¶ 195} McKelton objects to the admission of several photographs of him taken by police after Allen's death, some of which depicted his tattoos. The police had photographed the tattoos "just for identification purposes." The prosecutor mentioned the tattoos during closing arguments, stating, "It's almost beyond [parody] to sit here and imagine how it happened, the defendant having a tattoo that says, straight killer, but that's his [tattoo]."

{¶ 196} We agree that the tattoo photos should have been excluded under Evid.R. 403. The photographs encouraged the jury to draw an improper inference that McKelton committed the crimes charged because his tattoos showed his comfort with death and guns. And other photographs at trial clearly confirmed McKelton's identity without depicting his tattoos. Thus, any minimal probative value that the photos may have had was outweighed by the danger of unfair prejudice.

{¶ 197} Nevertheless, given the overwhelming evidence of McKelton's guilt, we are unpersuaded that but for these photos, "the outcome of the trial clearly would have been otherwise." *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 69.

### b. Killing other witnesses

{¶ 198} Lemuel Johnson testified that McKelton offered to "take care of" some witnesses for Johnson's incarcerated brother and described his past success in preventing witnesses (including Evans) from testifying. Defense counsel objected. The court warned the jurors not to consider the testimony as evidence of McKelton's "character * * * in order to show that he acted in conformity or in

accordance with that character."[10]   The state now argues that the evidence was admissible to prove McKelton killed witnesses to silence them.

{¶ 199} Evidence of a certain modus operandi is admissible under Evid.R. 404(B) "because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator."  *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).  But to be admitted for this purpose, evidence of other acts "must be related to and share common features with the crime in question."  *Id.*

{¶ 200} Here, Johnson's testimony does not establish a distinctive behavioral fingerprint.  But Johnson's testimony also established the context for McKelton's admissions about Allen and Evans.  And the trial judge clearly instructed the jurors that they could not rely on evidence about how McKelton treated witnesses to show his character or for any other improper purpose.  Thus, we do not find error.

### c.  Witness intimidation

{¶ 201} Detective Gregory testified that he received a frantic phone call from Michael Nix early on September 26, 2010.  Nix said that an associate of McKelton had approached him at a party and asked how McKelton's trial was going to go.  Nix had replied that he did not know.  The associate then left the party.  Twenty minutes later, someone fired shots at Nix from a passing car.

{¶ 202} This testimony is not improper evidence of *another* act.  Instead, it is evidence to support the charge that McKelton tried to prevent a witness from testifying against him *in this trial*.  Evidence that McKelton may have interfered with a witness's testimony in this trial is highly probative of his consciousness of

---

[10] On redirect, the prosecutor alluded to the identity of other victims.  McKelton argues that trial court erred by overruling an objection to leading questions on this topic.  But these questions were not leading: they did not suggest an answer. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 149.  And even if they had been, they did not prejudice McKelton because Johnson had already testified that McKelton said he had killed multiple witnesses.

guilt. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 68. Thus, this evidence was admissible.

### d. "C Murderer"

**{¶ 203}** Detective Gregory stated that McKelton's street name was "C Murderer." In *State v. Gillard*, this court held that the prosecutor's repeated references to the significance of the defendant's nickname, "Dirty John," were "improper attempts to impugn Gillard's character." 40 Ohio St.3d at 230, 533 N.E.2d 272, *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997). By contrast, here the state made a single reference to McKelton's nickname and did not argue the significance of that nickname. We cannot reverse for plain error, because "it is not clear that, had the nickname not been improperly used, the outcome of the trial would have been different." *Id.*

### e. "Serial killer"

**{¶ 204}** Sheridan Evans testified that police should not have called Crystal when looking for Evans because doing so "was like throwing meat to a tiger when you know this man is a serial killer." The danger of unfair prejudice from Sheridan's description of McKelton as a "serial killer" exceeded any possible probative value. But because we are unpersuaded that this evidence was outcome-determinative, we do not reverse for plain error.

### f. "Killer" and "robber boy"

**{¶ 205}** Shaunda Luther testified that Allen referred to McKelton and his companions, one of whom had been indicted for a triple homicide, as "killers" and to McKelton as a "robber boy," meaning a "person who robs other drug dealers."

**{¶ 206}** Luther's testimony showed that Allen was aware of McKelton's past criminal behavior and that Allen may not have reported McKelton's repeated domestic violence to police because she was afraid of McKelton. In other words, the statements were offered to show Allen's perception of McKelton and their relationship, not to prove that he was a murderer or a robber. And the trial court

reduced any danger of unfair prejudice by issuing a limiting instruction to the jury. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194.

{¶ 207} McKelton objects to the state's implication that Audrey Dumas set up robbery victims for him and that these schemes generated the money that she sent to him in prison. She testified that she later refused to play the "role" of his girlfriend because McKelton and Crystal had a baby. The state implied that by this "role," Dumas meant not only sending McKelton money, but also facilitating robberies and providing an alibi. But this series of questions and answers was relevant to Dumas's status as a witness identified with an adverse party, and the trial court did not err by admitting it.

### g. Drug activity

{¶ 208} Several witnesses testified about McKelton's drug activity. First, Lemuel Johnson testified that he and McKelton were engaged in a drug-related transaction when McKelton offered to take care of some witnesses for him. This testimony provided context for McKelton's offer to take care of the witnesses against Johnson's brother. The trial court twice instructed the jury not to draw improper inferences from it. We presume that the jurors followed these instructions. *See Loza*, 71 Ohio St.3d at 79, 641 N.E.2d 1082.

{¶ 209} Second, Crystal referred to McKelton's drug activity when answering the prosecutor's questions about McKelton's "business" and family telephone numbers. Cell-phone records featured prominently in the police investigation. and Crystal's testimony explained why McKelton had more than one phone number and why he changed his numbers once a week. Moreover, any error in admitting this evidence was harmless because other witnesses spoke with more detail about McKelton's drug activity.

{¶ 210} Third, Charles Bryant testified that he and McKelton had engaged in "dope dealing" in the past, but this testimony bolstered Bryant's credibility as an informant by providing context for McKelton's confession to him. And Andre

Ridley testified that Evans claimed that McKelton had given him 20 ounces of cocaine, with an estimated value of $20,000 or $40,000, after the men moved Allen's body, which suggests that McKelton bribed Evans to keep him from reporting Allen's murder and for helping dispose of her body. These pieces of evidence were highly probative, and their value far outweighed the danger of unfair prejudice.

{¶ 211} Finally, McKelton objects to evidence about his "lavish lifestyle as a drug dealer." Luther testified that McKelton gave Allen significant amounts of money. But evidence about Allen's financial dependency on McKelton was relevant to the state's effort to establish a cycle of domestic violence, the first step of which is "the tension building phase," when tension keeps rising as a result of economic-power issues in the relationship. And the prejudicial impact of this testimony was minimal, given that Luther did not address the source of McKelton's money.

### h. Rumors

{¶ 212} Several state witnesses said that they had heard rumors about who was responsible for the murders. "Rumors * * * are prototypical examples of inadmissible hearsay." *Weaks v. North Carolina Dept. of Transp.*, 761 F.Supp.2d 289, 306 (M.D.N.C.2007).

{¶ 213} Sheridan Evans testified about a conversation in which McKelton had told her that "Pooh," Michael McNeil, had killed Evans. She responded, "Well, Pooh said you did it." This testimony was offered to provide context for McKelton's threatening reaction when he was accused of the murder.

{¶ 214} Marcus Sneed testified that in two conversations, he asked McKelton whether what "everybody was saying in the street" about the murders was true. The testimony provided context for McKelton's responses admitting involvement in the murder of Allen and Evans.

{¶ 215} Crystal testified about rumors that she did not associate with McKelton after her brother's death because of "rumors that he had something to do with [her] brother's death." This testimony was presented to show Crystal's state of mind when she initially spoke to police.

{¶ 216} Lemuel Johnson testified on cross-examination that he believed McKelton's accounts about eliminating witnesses, saying, "I already knew from the streets that he was telling the truth." But *defense counsel* invited this testimony by inquiring whether Johnson believed McKelton "was being serious about these witnesses that he was telling [Johnson] about."

{¶ 217} In all these instances, evidence was offered for a nonhearsay purpose and not for the truth of the matter asserted. Accordingly, there was no violation of hearsay rules or the Confrontation Clause. *See Davis*, 547 U.S. at 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (only testimonial statements implicate the Confrontation Clause). And in each situation, the trial court reasonably permitted the evidence under Evid.R. 403 because its probative value outweighed any unfair prejudice to McKelton.

### i. "Generalized testimony"

{¶ 218} McKelton next objects to the admission of allegedly prejudicial "generalized" statements that he was unable to meaningfully refute at trial. Most of the statements cited by McKelton are discussed elsewhere in this opinion. And his remaining objections are meritless.

### j. References to rap songs

{¶ 219} McKelton argues that the state attempted to vilify him by making irrelevant and prejudicial references to rap songs.

{¶ 220} Andre Ridley testified that, by Evans's account, McKelton had gotten the idea to throw "some dope" by Allen's body from a rap song. Ridley's reference to the rap song was a detail that lent credibility to Evans's description of how McKelton disposed of Allen's body, which was crucial to establishing both

that McKelton had committed crimes against Allen and that Evans had witnessed those crimes.

{¶ 221} The trial court did not abuse its discretion by admitting this evidence.

### k. Battles Co.

{¶ 222} Over defense objection, Detective Witherell testified about a jailhouse letter from McKelton to Crystal. The letter states, "[I]n July when we find out everyone they are using, we gone get there records and post them up all over * * * Co." Immediately preceding "Co." is a seven-letter word that begins with a capital "B." Witherell read the word as "Battles," which he took to refer to JC Battle & Sons Funeral Homes, Inc., a funeral parlor near Crystal's home. He thought that McKelton wanted to post the names of potential witnesses at a funeral home to convey a "subtle" message that their safety was in peril. He explained that he knew how "information is disseminated in certain [Cincinnati] neighborhoods" and that the letter concerned him in light of "McKelton's history in terms of witnesses."

{¶ 223} Evidence of plans to threaten witnesses was probative of McKelton's consciousness of guilt as well as McKelton's method of operating, and the defense had opportunity to press Witherell about the basis for his opinion. Thus, we are not persuaded that this testimony violated Evid.R. 403. *See Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 68.

### l. McKelton's treatment of women

{¶ 224} The state introduced other jailhouse letters from McKelton to Crystal Evans that, according to McKelton, were not relevant. These letters did include profanity, sexually explicit content, and racial comments. But they were probative of his relationship with Crystal, and the state was entitled to explore that relationship because she was his alibi. McKelton offers no explanation of how this evidence unfairly prejudiced him.

**{¶ 225}** The jury also heard a recorded jailhouse phone call in which McKelton swore at Dumas repeatedly and demanded that she bring him money. During the conversation, Dumas told McKelton that she did not wish to be involved with him now that he had a son with Crystal. This evidence was relevant to explore Dumas's potential bias in favor of McKelton. And contrary to McKelton's suggestions, the state did not improperly rely on her testimony to encourage inferences about his treatment of all women.

**{¶ 226}** Charles Bryant testified that McKelton advised him that "females can't be trusted," are "good with lying," and have to be watched. McKelton then referred to Allen as "scandalous and running her mouth." The state introduced this evidence to show the course of the conversation in which McKelton confessed to murdering Allen and to suggest a possible motive for that murder—McKelton did not trust Allen. But the state did not imply that McKelton's general attitude towards all women explained why he killed Allen. *Cf. State v. Johnson*, 71 Ohio St.3d 332, 340, 643 N.E.2d 1098 (1994) (prosecutor impermissibly relied on defendant's general hatred of women—"evidence of a character trait" under Evid.R. 404(A)—to prove that he killed a particular woman). Thus, the trial court reasonably allowed the evidence under Evid.R. 403.

### m. Gruesome photographs

**{¶ 227}** The state introduced 15 autopsy photographs of Allen's body, each capturing her injuries from a different angle or perspective. Allen's body appears decomposed and discolored in some photographs. Others show extracted body parts.

**{¶ 228}** This court "strongly caution[s] judicious use" of gruesome photos in capital cases. *Morales*, 32 Ohio St.3d at 259, 513 N.E.2d 267. Accordingly, a gruesome photograph is admissible only if its "probative value * * * outweigh[s] the danger of prejudice to the defendant." *Id.* at 258. Moreover, even a photo that satisfies the balancing test is inadmissible if it is "repetitive or cumulative." *Id*.;

*see State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). A trial court's decision that a photo satisfies this standard is reviewable only for abuse of discretion. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69.

{¶ 229} Here, the state had the burden to prove that McKelton killed Allen and committed gross abuse of her corpse, and these photos were probative of those facts. *See State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984). The photos were not repetitive or cumulative, because they depicted different injuries to the face and neck, as well as insect activity that the coroner used to estimate time of death. Cf. *State v. Watson*, 61 Ohio St.3d 1, 7, 572 N.E.2d 97 (1991) (five autopsy photos of the same gruesome head wound were unnecessary and cumulative since the defense had not disputed the manner and cause of death).

{¶ 230} McKelton also argues that the risk of undue prejudice was especially great because one juror was prone to faint upon viewing gruesome images. But the defense *objected* to excusing the juror for cause. In addition, the record indicates that this juror responded only to photos of Evans, not to those of Allen. Thus, there is no reason to believe the juror was unduly swayed by the photos of Allen.

{¶ 231} Finally, McKelton says that the autopsy photos should not have been reintroduced at the mitigation phase. Defense counsel objected at trial, and the state argued that the photos were relevant to the crimes witnessed by Evans, which provided the basis for the aggravating circumstance at sentencing. The trial judge overruled the objection, but later instructed the jurors that they could consider the "evidence in terms of whether it tends to prove or disprove an aggravating circumstance[] of the case only," and not for any other purpose. We must presume that the jurors followed this instruction. *Loza*, 71 Ohio St.3d at 79, 641 N.E.2d 1082.

### n. Other "irrelevant or unfairly prejudicial evidence"

{¶ 232} McKelton next alleges that the trial court erred by admitting "additional irrelevant or unfairly prejudicial evidence," which was part of a prosecutorial "campaign to depict [him] as the type of person who would commit crimes like those charged."

{¶ 233} First, McKelton objects to hearsay testimony that his daughter had told Z.D. that he had "choked her mother with a phone cord" and warned Z.D. to "watch out for" Allen. We addressed this argument in our analysis of proposition of law No. 11.

{¶ 234} Second, the prosecutor introduced a copy of *The Anarchist Cookbook,* a book published in 1971 "for entertainment purposes only," that police had found in Allen's master bedroom. This book's author describes it as a volume "on all the subjects (from drugs, to weapons, to explosives) that are currently illegal, but the publisher added the following disclaimer: "its recipe should not be used as they do not pretend to be accurate." The state argues that the book was relevant to establishing that McKelton lived in Allen's house. But the state did not introduce evidence that the book belonged to McKelton. While the book appears to be at least partly satirical, given its title, the book should not have been admitted. But given the overwhelming evidence of McKelton's guilt, its admission did not rise to the level of plain error.

{¶ 235} Third, McKelton argues that the prosecutor asked Melinda Nagel, Allen's physical therapist, an inflammatory, hypothetical question that was unsupported by the record. Generally, "[h]ypothetical questions directed to a witness must be based on facts supported by or adduced from the evidence." *Olsen v. Elec. Auto-Lite Co.*, 164 Ohio St. 283, 284, 130 N.E.2d 363 (1955). But here the *defense* introduced this line of inquiry on cross-examination by asking Nagel how she would have treated Allen *if* Allen had reported being hit with a baseball bat. The prosecutor "pick[ed] up on" this line of questioning on redirect, asking, "[I]f

[Allen] had told you her boyfriend broke her ankle by slamming a car door on it repeatedly, would that have changed your treatment plan * * *?" This was a fair response to the defense's cross-examination.

{¶ 236} Fourth, Charles Bryant testified that he and McKelton had been driving around drinking when they discussed Allen. Bryant said that he had been smoking marijuana and drinking Grey Goose with cranberry, while McKelton had been drinking straight Grey Goose. These details lent credibility to Bryant's testimony about McKelton's confession by establishing the context of their conversation, and the trial court reasonably decided to admit them under Evid.R. 403.

{¶ 237} Bryant testified that he had met McKelton in jail when McKelton was charged with either intimidation of a witness or contempt of court. Any probative value in explaining the circumstances under which Bryant met McKelton was substantially outweighed by the danger of unfair prejudice because McKelton was on trial for an unrelated charge of witness intimidation. Even so, we find no basis to reverse for plain error; notably, McKelton was acquitted on the witness-intimidation charge in this case.

{¶ 238} Finally, Marcus Sneed testified that he had known a man named "Fat Boy" who "[e]nded up alongside of a road." According to Sneed, McKelton had talked to Sneed about setting Fat Boy up to be robbed. The trial court sustained a defense objection to this testimony and instructed the jury to disregard it. We presume that the jury followed the trial court's instruction. *See Loza*, 71 Ohio St.3d at 79, 641 N.E.2d 1082.

{¶ 239} For all these reasons, we reject McKelton's fifth proposition of law.

## C. Jury Instructions and Verdict Forms

### 1. Trial Phase: Proposition of Law No. 12

{¶ 240} In proposition of law No. 12, McKelton argues that his constitutional rights were violated because (1) the state did not present a cohesive

theory about Germaine Evans's death, (2) the jury received instructions on complicity but no verdict form on it, and (3) the jury did not reach a unanimous verdict on whether McKelton was the principal offender or only complicit in Evans's death.

### a. Factual background

{¶ 241} The state charged McKelton with the aggravated murder of Evans under R.C. 2903.01(A). In a bill of particulars, the state alleged that McKelton caused Evans's death "by a single gunshot wound to the back of the head." McKelton later filed a notice of alibi for the night Evans died, but the state did not amend the bill of particulars to allege that McKelton had aided or abetted in the killing of Evans.

{¶ 242} At trial, the state sometimes implied that McKelton himself had shot Evans and at other times suggested that McKelton had orchestrated the murder. The state offered no evidence of who fired the shot if not McKelton. Over defense objection, the trial court agreed to instruct the jury on complicity. The defense then requested a special verdict on that issue, arguing that the jury needed to unanimously find either that McKelton was the principal offender or that he had "solicited, aided, abetted or procured" the murder. The defense offered no legal authority that such an instruction was required. The trial court denied the request.

### b. Analysis

{¶ 243} McKelton alleges several errors related to complicity. First, he says that the state's inconsistent theories of the case "did not present sufficient evidence to find that McKelton killed Evans beyond a reasonable doubt." We will address this argument in our analysis of McKelton's sufficiency claim in proposition of law No. 13.

{¶ 244} Second, he argues that the trial court erred by instructing the jury on complicity. Under R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of [that] section, or in terms of the principal offense." Accordingly, a

defendant who is "indicted for aggravated murder in terms of the principal offense * * * [is] on notice that evidence could be presented that he was either a principal offender, or an aider and abetter." *State v. Ensman*, 77 Ohio App.3d 701, 703, 603 N.E.2d 303 (11th Dist.1991). This is true even when the state has issued a bill of particulars that refers to a defendant only as the principal offender. *See Hill v. Perini*, 788 F.2d 406, 407-408 (6th Cir.1986). As a result, a jury instruction on complicity is proper as long as "the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor." *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976), paragraph five of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156 (1978).

{¶ 245} McKelton argues that the *Perryman* rule applies only when the *defendant* presents evidence of complicity at trial, while here, the *state* introduced evidence to support a finding of complicity. But McKelton's narrow reading of *Perryman* is inconsistent with the broad language of the court's syllabus in that case, which "unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal." *State v. Payton,* 8th Dist. Cuyahoga Nos. 58292 and 58346, 1990 WL 48952, *8 (Apr. 19, 1990).

{¶ 246} A complicity instruction was proper here because the evidence could reasonably be found to have proven that McKelton was an aider and abettor. The jury could have reasonably interpreted his admissions to having killed Evans to mean either that he was the principal offender or that he encouraged, cooperated with, or incited someone else to commit the crime.

{¶ 247} Finally, McKelton objects that the trial court "created an unacceptable risk" that the jury did not unanimously convict him of aggravated murder because it did not provide for a separate verdict on complicity. Under Ohio law, "there is no distinction between a defendant convicted of complicity or as a

principal offender." *State v. Alexander*, 6th Dist. Wood No. WD-02-047, 2003-Ohio-6969, ¶ 70. And the state need not even prove "[t]he identity of the principal * * * to establish the offense of complicity by aiding and abetting." *In re T.K.,* 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, paragraph one of the syllabus.

{¶ 248} We have previously rejected claims that a unanimity instruction is required under similar circumstances. *See State v. Stojetz*, 84 Ohio St.3d 452, 458, 705 N.E.2d 329 (1999). Likewise, several intermediate appeals courts have held that a trial court need not "provide separate jury verdict forms for the principal offense and complicity to that offense." *State v. Horton*, 10th Dist. Franklin No. 13AP-855, 2014-Ohio-2785, ¶ 10 (citing cases). By the same reasoning, we reject McKelton's claim that the trial court was required to give specific instructions or provide for a separate verdict on complicity.

{¶ 249} For these reasons, proposition of law No. 12 fails.

### 2. Mitigation Phase: Proposition of Law No. 18

{¶ 250} In proposition of law No. 18, McKelton claims that the trial judge improperly allowed the jury to determine which evidence from the trial phase was relevant for sentencing. McKelton did not raise this objection below, so plain-error review applies. *See State v. Bey*, 85 Ohio St.3d 487, 497, 709 N.E.2d 484 (1999).

{¶ 251} After mitigation-phase opening arguments, the trial court advised the jury that the state had "reintroduced evidence * * * which is relevant to the aggravating circumstances." He further explained that the jury would "not have all the evidence that [it] previously considered" because some of the trial-phase evidence was irrelevant to the jury's sentencing consideration.

{¶ 252} The trial judge told the jurors that they could consider only a single aggravating circumstance: that McKelton purposely killed Evans to prevent his testimony in a criminal proceeding. The jury was told to "consider all of the testimony and evidence relevant to the aggravating circumstance the Defendant was found guilty of committing." Later the judge clarified,

> Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in this sentencing phase. For purposes of this proceeding, only that evidence admitted in the trial phase that is relevant to the aggravating circumstance and to any of the mitigating factors is to be considered by you. You will also consider all of the evidence admitted during this sentencing phase.

The judge warned the jury to consider only those exhibits that he gave to the jury foreperson.

{¶ 253} When evaluating claims that a trial judge left relevance determinations to the jury at the sentencing phase, we consider "the penalty-phase instructions as a whole." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 214. As long as the instructions "adequately informed the jury as to the evidence to consider during the penalty phase," we will not find error. *Id.* We have rejected similar claims when instructions (1) limited the jury's consideration of the guilt-phase evidence to the relevant aggravating circumstances and the mitigating factors, *id.*, and (2) made it "clear that the jury would see only those guilt-phase exhibits that the trial judge admitted and deemed relevant." *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 251.

{¶ 254} Here, the trial judge satisfied both requirements. Viewing the instructions as a whole, we find that it is reasonable to conclude that "the jury understood that they would see only the evidence that the *trial judge* deemed relevant." (Emphasis sic.) *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 152. Moreover, it was clear that only one aggravating circumstance was relevant for sentencing purposes.

{¶ 255} Accordingly, we reject proposition of law No. 18.

### D. Prosecutorial Misconduct: Propositions of Law Nos. 8 and 17

{¶ 256} In proposition of law Nos. 8 and 17, McKelton alleges due-process violations because of cumulative prosecutorial misconduct.

{¶ 257} When reviewing a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To answer that question, we consider whether the conduct was improper and whether it prejudicially affected the defendant's substantial rights. *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 243. In evaluating prejudice, we determine the effect of the misconduct "on the jury in the context of the entire trial." *Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203.

### 1. Good-Faith Basis for Questions

{¶ 258} McKelton argues that the prosecutor lacked a good-faith basis to ask questions posed to Mindie Nagel and Audrey Dumas. Because McKelton did not raise this objection at trial, the prosecutor did not have an opportunity to explain the basis for his questions on the record. Under these circumstances, we presume that a good-faith basis existed. *Gillard*, 40 Ohio St.3d at 231, 533 N.E.2d 272; *Blackshere*, 1997 WL 82808, at *4.

### 2. Inflammatory Victim-Impact Evidence

{¶ 259} McKelton objects that the prosecutor improperly introduced inflammatory victim-impact evidence. Victim-impact evidence that relates only "to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), is generally inadmissible at the trial phase, but such evidence can be admissible if it also "relat[es] to the facts attendant to the offense," *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

{¶ 260} The alleged victim-impact testimony that McKelton identifies is either not the victim-impact testimony discussed in Payne, which relates only to the victim's personal characteristics or the emotional impact on the victim's family, or it relates only to the facts attendant to one of the charged offenses. *See id.* As such, this evidence cannot form the basis of a misconduct claim.

### 3. Character Evidence

{¶ 261} According to McKelton, the prosecutor repeatedly presented "him as a cold, unrepentant criminal who used threats to control people." McKelton cites three exchanges that revealed information about his criminal history and drug activity: (1) Detective David Gregory testified that he had listened to "hundreds of hours of" recordings of McKelton's jailhouse phone calls, (2) Crystal Evans testified that McKelton "probably was selling drugs" in 2009, and (3) Detective Keith Witherell testified about the "Battles" letter. Detective Gregory's testimony was not improper character evidence; it was relevant to establish that Gregory could identify McKelton's voice. And we have already explained in our analysis of proposition of law No. 5 that Crystal's and Witherell's statements were properly admitted.

{¶ 262} Because the evidence cited by McKelton was properly admitted, we reject his claim that the prosecutor committed misconduct by introducing it.

### 4. Wilson's Prior Inconsistent Statement

{¶ 263} McKelton alleges that the prosecutor engaged in misconduct by using Wilson's prior statement as substantive evidence. As explained in the analysis of proposition of law No. 6, the prosecutor did err, but the error was not outcome-determinative. Likewise, this conduct, viewed in isolation, did not prejudicially affect McKelton's substantial rights.

### 5. Leading Questions

{¶ 264} McKelton argues that the prosecutor engaged in misconduct by "improperly ask[ing] leading questions of several witnesses." He claims that "[t]he

State essentially testified for its informants" on redirect. Beyond this broad assertion, however, McKelton does not analyze any specific questions asked, or how they prejudiced him. We therefore reject this claim of misconduct.

{¶ 265} McKelton also suggests that the prosecutor committed misconduct by asking leading questions even after the trial court sustained defense objections on that basis. We have recognized that prosecutorial misconduct can occur when a prosecutor continues to ask leading questions even after the trial court has sustained objections on that basis. *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 170. But in *Diar*, the prosecutor pursued a line of leading questions immediately after the court ruled that they were improper. By contrast, McKelton argues that the prosecutor should not have put leading questions to *other* witnesses after the trial court sustained objections to leading questions. Moreover, McKelton fails to identify specific leading questions that the prosecutor should have refrained from asking in light of the trial court's ruling.

### 6. Disclosure of an Incorrect Witness Address

{¶ 266} McKelton objects that the state engaged in misconduct by giving the defense an outdated address for one of its witnesses, Andre Ridley. The prosecutor explained that the error was unintentional and argued that no prejudice had occurred because McKelton's investigator had not even gone to the address provided. The trial judge offered to remedy the error by permitting the defense investigator to speak with Ridley and allowing the defense to call Ridley as a witness during its case-in-chief. Defense counsel said they would let the court know whether they wanted to pursue that course by the next morning, but there is no further discussion of the issue on the record. The defense called no witnesses in its case-in-chief.

{¶ 267} Under these circumstances, McKelton has failed to establish prejudice.

### 7. Mischaracterizing Evidence

**{¶ 268}** In addition, McKelton claims that the prosecutor mischaracterized three pieces of evidence adduced at trial. He asserts that these " 'improper insinuations and assertions calculated to mislead the jury' " violated his right to a fair trial, quoting *Berger v. United States*, 295 U.S. 78, 85 (1935). He did not object at trial, so plain-error review applies. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 84.

**{¶ 269}** First, during closing argument, the prosecutor referred to one of McKelton's tattoos, which had the words "scandalous life" in it, and asked the jury, "Do you remember hearing scandalous come up again?" He then said that Charles Bryant had testified that McKelton had "called [Allen] a scandalous bitch" and had confessed to choking her. According to the trial transcript, however, Bryant testified that McKelton, using a "whole lot of foul words," had said that Allen "was scandalous and running her mouth."

**{¶ 270}** There is some disparity between the prosecutor's description of Bryant's testimony and his actual testimony. However, before closing arguments began, the trial court instructed the jury:

> [I]f the attorneys represent facts and they are different than what you recall, you are to rely upon your collective memory during deliberations to decide whether or not those facts have been proven or not proven based upon the instructions of law.

Here, "a review of the challenged remarks demonstrates that the prosecutor simply set forth what he thought the evidence showed." *State v. Banks*, 8th Dist. Cuyahoga No. 97084, 2012-Ohio-2495, ¶ 41. And "[e]ven if the prosecutor's description of the witness's testimony was inaccurate, the trial court nevertheless instructed the jury to rely on its own recollection of the evidence." *Id.*

**{¶ 271}** Second, the prosecutor argued that Gerald Wilson, who had recanted on the witness stand, addressed McKelton as he left the courtroom. According to the prosecutor, Wilson "got up and looked at Calvin and goes, I got you. I got you, bud or bro, whatever that last word was. You'll have to use your memory. He looked right at him, nodded. I got you back." The transcript indicates that Wilson said, "Later on, Bro."

**{¶ 272}** As with Bryant's testimony, the prosecutor merely related his own observations about Wilson's testimony, which were not entirely confirmed by the record. But the jury was told to rely on its own recollection of the evidence, and McKelton offers no evidence that the jury disregarded that instruction.

**{¶ 273}** Finally, the prosecutor argued that McKelton had asked Audrey Dumas to provide an alibi for both murders. According to the prosecutor, after he killed Evans, McKelton thought, "I'm going to be with Crystal, and I'm going to have Audrey blowing my phone up all night long, so that later I can say, hey, I'm asleep with Crystal." The prosecutor also argued that McKelton expected Dumas to play her "role"—whether it was providing McKelton an alibi or bringing him money—and if she failed to do so, McKelton would threaten her.

**{¶ 274}** A prosecutor is entitled, as is defense counsel, to "wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). Counsel are permitted to "present their most convincing positions." *State v. Phillips*, 74 Ohio St.3d 72, 90, 656 N.E.2d 643 (1995). Here, the prosecutor reasonably exercised this latitude by drawing on Dumas's testimony, phone records, and other evidence to argue that she was not a credible alibi witness. We conclude that these comments were proper.

### 8. *Prosecutorial Comments about McKelton's Unsworn Statement*

{¶ 275} McKelton says that the cumulative effect of the prosecutor's improper comments about, among other subjects, McKelton's unsworn statement during mitigation-phase closing arguments rendered his trial unfair.

{¶ 276} McKelton's unsworn statement did not mention Missy Allen or Germaine Evans. In closing argument, the prosecutor said:

> You heard Calvin McKelton tell you, let me talk to you about why we're here. And you never heard him say Missy's name. You never heard him talk about Germaine Evans' death. * * * And you never heard Calvin McKelton say a single word about it.

{¶ 277} When a defendant chooses to make an unsworn statement, a prosecutor "may comment that the defendant's statement has not been made under oath or affirmation." *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), paragraph two of the syllabus. However, misconduct occurs when a prosecutor "refer[s] not only to credibility but also to appellant's silence on particular issues." *Lorraine*, 66 Ohio St.3d at 419, 613 N.E.2d 212.

{¶ 278} Here, the state concedes that its closing argument "cross[ed] [the] line in a couple of passing phrases." The prosecutor erred by commenting on McKelton's silence regarding Allen and Evans. But viewed in the context of the weight of the aggravating circumstance, these statements did not affect McKelton's substantial rights.

### 9. *Reference to Improper Aggravating Circumstances*

{¶ 279} McKelton says that the prosecutor "improperly referred to facts unrelated to the aggravating circumstance as 'the weight that goes on the side of that specification.' "

{¶ 280} During the sentencing phase of a capital trial, a prosecutor "may introduce and comment upon * * * any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. But the prosecutor may not "describe nature and circumstances evidence as a statutorily defined aggravating circumstance." *Id.* at 422. *See State v. Davis*, 38 Ohio St.3d 361, 367-373, 528 N.E.2d 925 (1988)).

{¶ 281} Here, a single aggravating circumstance was before the jury at sentencing: McKelton killed Evans to prevent his testimony in a criminal proceeding. R.C. 2929.04(A)(8). The prosecutor directed the jury's attention to this specification and argued that the following is "weight that goes on the side of that specification": (1) Evans knew that McKelton killed Allen, dumped her body, and attempted to burn her house, (2) McKelton knew that Evans was aware of these facts and was the only person who could connect him to those crimes, and (3) Evans's dead body was found in a park, and McKelton never paid his respects.

{¶ 282} The prosecutor should not have discussed McKelton's failure to pay respect to Evans, but, viewed in context, this error did not affect McKelton's substantial rights. The prosecutor made clear that only one specification was at issue and advised the jury to weigh *that* against all the mitigation evidence. In addition, the trial judge accurately instructed the jury on the weighing process and told the jurors that they could "not consider the nature and circumstances of the crime as an aggravating circumstance." The remaining facts regarding the crimes witnessed by Evans tended to prove the essential elements of the specification, and the prosecutor's discussion of those facts was therefore proper.

### 10. *Prosecutor's Focus on Allen, Rather Than Evans*

{¶ 283} Next, McKelton objects that the prosecutor focused more on Allen's death than Evans's during the mitigation phase, even though the killing of

Evans was the capital offense. By doing so, he says, the prosecutor turned the one aggravating circumstance at issue into two.

**{¶ 284}** As already noted, during the mitigation phase of a capital trial, a prosecutor may introduce evidence of and comment on any aggravating circumstance for which a defendant was convicted. *Gumm*, 73 Ohio St.3d at 421, 653 N.E.2d 253. Here, the aggravating circumstance is predicated on the victim's having witnessed another criminal offense. Accordingly, the prosecutor was permitted to discuss the underlying criminal offenses. We therefore reject McKelton's argument that the prosecutor turned one aggravating circumstance into two.

### 11. Reference to the Prosecutor's Childhood

**{¶ 285}** McKelton claims that the prosecutor erroneously compared their childhoods during sentencing.

**{¶ 286}** "Neither the defense nor the prosecution may refer to evidence that is not in the record." *State v. Brown*, 38 Ohio St.3d 305, 316, 528 N.E.2d 523 (1988), fn. 7. Accordingly, counsel should not state facts of his or her own personal experience during closing arguments. *See State v. Beck*, 2010 SD 52, 785 N.W.2d 288, ¶ 16; *State v. Williams*, 96-1023 (La. 1/2/1998), 708 So.2d 703, 716. When a prosecutor did refer to matters outside the record, we found no prejudice because the reference was "short, oblique, and justified as a reply to defense arguments and elicit[ed] no contemporaneous objection." *Lott*, 51 Ohio St.3d at 166, 555 N.E.2d 293.

**{¶ 287}** In closing argument, defense counsel first raised the issue of childhood, contrasting McKelton's background to his own. He stated he had been raised in an upper-middle-class environment by parents who had high expectations for their children. He contrasted that to the environment McKelton was raised in, "where he had no expectations, where he had to fend for himself, * * * where

violence, robbery, prostitution and drugs are [the] norm." He said it was rare for people to overcome those obstacles.

{¶ 288} In rebuttal, the prosecutor cited his own childhood experiences: "I know what it's like to grow up in the projects. I was sitting at the kitchen table, had a single mother open up a can of Spaghetti'Os and offer those to everybody. I didn't grow up to be a murder[er]."

{¶ 289} The prosecutor erred by alluding to his own personal experience, but no prejudice occurred because all three *Lott* criteria are satisfied here. The reference was brief, the comments were justified in response to defense counsel's comparison of McKelton's childhood to his own, and McKelton did not object at trial. Under these circumstances, no prejudicial error occurred.

### *12. Autopsy Photos*

{¶ 290} McKelton recasts as prosecutorial misconduct his claim that it was error to reintroduce Allen's autopsy photos during mitigation. As explained in the analysis of proposition of law No. 5, the trial court did not err in this regard. "If the evidence was properly admitted, then the prosecutor's decision to offer it cannot form the basis of a misconduct claim." *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 116.

### *13. Cumulative Prejudice*

{¶ 291} Finally, McKelton argues that the cumulative effect of the prosecutor's misconduct deprived him of a fair trial, undermining his conviction and his sentence. Viewed in context of the trial, we cannot conclude that the prosecutor's conduct prejudicially affected McKelton's substantial rights. *See Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203.

{¶ 292} For all these reasons, we reject proposition of law Nos. 8 and 17.

### E. Ineffective Assistance of Counsel: Proposition of Law Nos. 15 and 16

{¶ 293} In his 15th and 16th propositions of law, McKelton argues that counsel provided constitutionally ineffective assistance. To establish ineffective

assistance, McKelton must (1) show that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms" and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. When performing this analysis, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

### 1. Trial Phase

{¶ 294} McKelton argues that defense counsel "failed in several ways to provide a basic defense" for him at the trial phase.

{¶ 295} First, McKelton recasts several propositions of law as ineffective assistance because trial counsel failed to object. We have rejected each of the underlying propositions on its merits. The same reasoning, taken to its logical conclusion, also justifies our denial of McKelton's *Strickland* claim.

{¶ 296} Second, McKelton says that trial counsel should have voir dired the jury after "a courtroom incident" that occurred on October 8. As an unidentified man left the courtroom for an afternoon break, he "said something towards the prosecution and towards the defense table." According to defense counsel, 11 jurors were in the courtroom at the time of the "outburst." The judge offered "to voir dire the jury * * * to make sure that none of [the jurors] saw anything which they believe would in any way prejudice their ability to be fair and impartial." Defense counsel declined the offer. McKelton now claims that defense counsel should have accepted.

{¶ 297} This "court generally will not second-guess counsel's judgments about what questions to ask on voir dire" when reviewing claims of ineffective assistance during pretrial voir dire. *State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 128. This deference is appropriate because "counsel is in the best position to determine whether any potential juror should be

questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶ 298} We apply the same deference to trial counsel's decision here. Trial counsel observed the incident, which he described as an "outburst" that "happened very quickly." Under the circumstances, counsel could reasonably decide not to question the jury, and McKelton was not prejudiced by that decision.

{¶ 299} Third, McKelton argues that trial counsel were ineffective for not trying to sever the first two counts of the indictment. Ohio "law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293, quoting Crim.R. 8(A). But a defendant is entitled to severance under Crim.R. 14 if he can affirmatively show prejudice. *Id*. Even then, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of either of the offenses, if they had been severed for trial, as "other acts" under Evid.R. 404(B) or (2) the "evidence of each crime joined at trial is simple and direct." *Id.*

{¶ 300} It is unlikely that the trial court would have granted severance. Counts One and Two charged McKelton with felonious assault and domestic violence for the May 2008 incident that resulted in Allen's broken ankle. Counts Four and Five charged him with felonious assault and domestic violence for the July 2008 incident that resulted in Allen's death. These four offenses are of similar character, since they allege that McKelton committed the same offenses against the same victim on two different occasions. *See State v. Miller*, 105 Ohio App.3d 679, 692, 664 N.E.2d 1309 (4th Dist.1995). And the evidence of each offense was "not rendered more complex or confusing by joining the two counts of domestic violence." *Id.* Thus, McKelton would not likely have prevailed on a severance motion, and his trial counsel were not ineffective for failing to object.

{¶ 301} Finally, McKelton argues that trial counsel provided ineffective assistance during plea negotiations. McKelton says that he rejected counsel's advice to take a plea bargain only because they had failed to adequately communicate with him or investigate his case. But this claim is purely speculative. *See State v. Keith*, 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47 (1997) (claims that require evidence outside the record are not appropriately considered on direct appeal). In addition, this assertion is undermined by evidence in the record. At a pretrial hearing, McKelton told the trial judge that he had rejected the plea offer because he wanted an opportunity "to prove [his] innocence."

{¶ 302} McKelton's reliance on two recent United States Supreme Court decisions is also unavailing. *See Missouri v. Frye*, __ U.S. __, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012); *Lafler v. Cooper*, __ U.S. __, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012). In *Frye*, the Supreme Court held that trial counsel may be ineffective if they fail to communicate the terms of a plea offer to a defendant. *Frye* at 1408. And in *Cooper*, the Supreme Court held that prejudice may arise under *Strickland* if counsel's deficient performance caused a defendant to *reject* a plea deal that would have resulted in a lower sentence. *Cooper* at 1385. Here the record indicates that McKelton's trial counsel explained the terms of the plea offer, but he rejected their advice to accept the deal.

### 2. Mitigation Phase

{¶ 303} McKelton also alleges several instances of mitigation-phase ineffective assistance of counsel.

{¶ 304} First, he contends that trial counsel's mitigation presentation was "barebones and not cohesive." "The presentation of mitigating evidence is a matter of trial strategy," *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 189, even if counsel's chosen strategy proves unsuccessful, *State v. Frazier*, 61 Ohio St.3d 247, 255, 574 N.E.2d 483 (1991). Here, defense counsel presented McKelton's unsworn statement and the testimony of three witnesses about his

difficult childhood and how he cares for his own children. On its face, we cannot say that this mitigation presentation was deficient.

{¶ 305} But even if McKelton could prove deficient performance, he cannot establish *Strickland* prejudice on this record. To do so, he would need to introduce evidence to prove that "sufficient mitigating evidence existed that would have called for a sentence less than death." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 62. This argument is "not appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000).

{¶ 306} Second, McKelton objects that trial counsel were unprepared for mitigation because they did not present any mitigation experts. Pursuant to defense counsel's application, the trial judge ordered $5,000 each "for an investigator, a defense psychologist, and a mitigation expert." The next month, the parties informed the trial court that there was no reason to pursue any competency issues. At that time, the judge asked defense counsel whether the investigator, forensic scientist, and mitigation expert had "been retained and * * * [were] hard at work." Defense counsel said yes.

{¶ 307} The defense counsel clearly stated that they had retained various experts. It is unusual for defense counsel not to present experts at a mitigation hearing. Yet we have never held that presenting expert testimony in mitigation is per se deficient performance. *See, e.g., State v. McGuire*, 80 Ohio St.3d 390, 399, 686 N.E.2d 1112 (1997) (hiring a mitigation specialist is not "a requirement of effective assistance"). In fact, depending on the expert's findings, such testimony may have been grounds for an ineffective claim. Therefore, trial counsel may have reasonably decided not to present a mental-health professional or a mitigation specialist for strategic reasons. Indeed, the day before the mitigation hearing began, counsel reassured the court that they had had a full opportunity to explore mitigation experts and "everything that is necessary to present mitigation in this case."

**{¶ 308}** In any event, McKelton cannot show that he was prejudiced by the alleged error. He does not identify any specific information that additional experts would have uncovered or explain why that information would have prompted the jury to recommend a life sentence. In fact, it would be impossible for him to make such a showing without relying on evidence outside the record, which is not permissible in a direct appeal. *Keith*, 79 Ohio St.3d at 536-537, 684 N.E.2d 47.

**{¶ 309}** Third, McKelton argues that defense counsel's closing argument was "devoid of advocacy and virtually gave the jury all the reasons it needed to vote for death." Trial counsel "are afforded wide latitude during closing arguments." *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 192. Accordingly, "[d]ebatable trial tactics generally do not constitute a deprivation of effective counsel." *Id.*

**{¶ 310}** Defense counsel's closing argument can be read as an effort to gain the jurors' trust and to give them a reason to impose a life sentence. He acknowledged the jury's guilt determination and emphasized that the mitigation hearing was not about trying to excuse or minimize McKelton's conduct. Given the severity of McKelton's crime, he advised the jurors to consider only the two most severe sentencing options available to them: death or life imprisonment without parole.

**{¶ 311}** Counsel then urged the jury to impose a life sentence, stressing two significant mitigating factors: McKelton's "character and his background." After reassuring the jurors that they need not like McKelton or his actions, counsel explained that he was a product of his difficult upbringing and that he knew only how "to sell drugs and be a menace to society." He argued that McKelton could function in prison, even if he had not been able to "conform his conduct to the requirements of a civilized society." With a life sentence, he would be able to guide his three children away from his own path.

**{¶ 312}** This closing argument was not devoid of advocacy and it did not invite a verdict of death. Instead, counsel attempted to acknowledge the jurors' likely feelings about McKelton and his actions while still giving them a reason to spare his life. Viewed in context of the entire closing, the statements McKelton objects to were part of a trial strategy meant to persuade the jury to not impose a death sentence. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio- 4190*,* 813 N.E.2d 637, ¶ 160. As a result, this allegation of ineffective assistance fails.

**{¶ 313}** Additionally, McKelton argues that his counsel were ineffective for not questioning a juror who was dismissed during mitigation-phase deliberations. Nearly six hours after deliberations began, the jury sent the trial judge a note stating that one juror was "not participating in this decision." The trial court later indicated that the juror in question had told the bailiff that she had hoped to leave because her mother was scheduled to have surgery the next day. At defense counsel's request, the trial judge voir dired the juror. She said that she needed to be in Virginia the next morning and could not "think of anything else." The judge then clarified: "So unequivocally you just do not want to continue and you're refusing to participate in any further discussions; is that an accurate statement?" The juror agreed. The prosecution and defense declined to question the juror further, and the court excused her. Defense counsel noted an objection for the record to excusing the juror, but he could not identify any alternative way to proceed.

**{¶ 314}** McKelton asserts that trial counsel should have questioned the juror further. He speculates that the juror—who did not ask to be excused—might have been a holdout but that she did not want to admit it on the record or in front of the media. But trial counsel were in the best position to evaluate whether further voir dire was necessary to ascertain the juror's true reason for refusing to participate. *See Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765. And we "generally will not second-guess counsel's judgments about what questions to ask on voir dire." *Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 128. More

important, McKelton's assertion that the juror was a holdout is purely speculative, so he cannot establish prejudice.

{¶ 315} McKelton's claims of ineffective assistance are unpersuasive. We reject proposition of law Nos. 15 and 16.

### F. Trial Court Bias: Proposition of Law No. 19

{¶ 316} In proposition of law No. 19, McKelton argues that his trial was fundamentally unfair as a result of the trial judge's bias and failure to properly control the presentation of evidence.

{¶ 317} In support of this claim, McKelton cites the errors alleged in proposition of law Nos. 1 to 13, 17, 18, and 19 as proof that the trial judge "continuously and to the point of showing bias permit[ted] the admission of prejudicial, irrelevant and otherwise inadmissible evidence." He also claims that the trial judge erroneously considered that evidence when imposing a death sentence. But short of pointing to errors alleged elsewhere in his brief, McKelton does not cite any additional proof of judicial prejudice or bias.

{¶ 318} As a general rule, "a judge's adverse rulings, even erroneous ones, are not evidence of bias or prejudice." *In re Disqualification of Fuerst*, 134 Ohio St.3d 1267, 2012-Ohio-6344, 984 N.E.2d 1079, ¶ 14; *see also State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001). And nothing else in the record supports McKelton's claim of bias.

{¶ 319} We reject proposition of law No. 19.

### G. Cumulative Error: Proposition of Law No. 21

{¶ 320} In proposition of law No. 21, McKelton argues that his convictions and sentence should be reversed on grounds of cumulative error.

{¶ 321} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not

individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶ 322} As explained above, several errors occurred at McKelton's trial, none of which rose to the level of reversible error. But errors "cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996); *see also State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 241. And here we are unconvinced that the cumulative effect of these errors deprived McKelton of a fair trial.

{¶ 323} We reject proposition of law No. 21.

### H. Sufficiency and Manifest Weight: Proposition of Law No. 13

{¶ 324} In proposition of law No. 13, McKelton challenges both the sufficiency and manifest weight of the evidence to convict him for the aggravated murder of Evans.

### 1. Sufficiency of the Evidence

{¶ 325} To resolve a sufficiency challenge, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Ohio's aggravated-murder statute provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." R.C. 2903.01(A). Thus, the jury had to find beyond a reasonable doubt that McKelton acted purposely, with prior calculation and design, to cause Evans's death.

{¶ 326} At trial, Marcus Sneed and Lemuel Johnson both testified that McKelton had confessed to murdering Evans. Sneed testified that McKelton stated that he had to murder Evans because Evans was the only one who could link McKelton to Allen's murder. And, according to Johnson, McKelton said he was experienced with killing witnesses such as Evans. Johnson claimed that when a

detective called Crystal looking for Evans, McKelton decided to kill Evans before the detective found him.

{¶ 327} Viewed in a light most favorable to the prosecution, a rational juror could have found the essential elements of aggravated murder beyond a reasonable doubt based on this evidence alone.

### 2. Manifest Weight

{¶ 328} To evaluate a manifest-weight claim, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The court must decide " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.' " *Id.*, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 329} McKelton points to gaps in the state's evidence and its reliance on informants as reasons to overturn his conviction. The state's case against McKelton did not include eyewitness testimony, the weapon used to murder Evans, or any forensic evidence linking him to Evans's body or the crime scene. But Johnson and Sneed did testify that McKelton admitted responsibility for Evans's murder. And contrary to McKelton's suggestion, we need not entirely dismiss the testimony of these witnesses just because they are jailhouse informants. Indeed, the credibility of the informants is bolstered by other evidence that corroborates aspects of their testimony.

{¶ 330} Although there are gaps in the state's evidence, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Thus, we reject proposition of law No. 13.

### I. Settled Issues: Proposition of Law No. 20

{¶ 331} Proposition of law No. 20 presents six oft-raised—and always rejected—constitutional challenges to Ohio's capital punishment scheme.

McKelton also argues that Ohio's death-penalty statutes violate international law and treaties. We summarily reject these various claims. *See, e.g., Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 215-216; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381-383.

### J. Independent Sentence Evaluation

{¶ 332} We now independently review McKelton's death sentence for appropriateness and proportionality. *See* R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether this death sentence is proportionate to those imposed in similar cases. *Id.*

### 1. Aggravating Circumstance

{¶ 333} McKelton was convicted of one count of aggravated murder and two death specifications. However, because these specifications were merged before sentencing, only one aggravating circumstance is before us: murder of the witness to an offense for the purpose of preventing his testimony in a criminal proceeding. R.C. 2929.04(A)(8).

{¶ 334} The evidence at trial supports the jury's finding of this aggravating circumstance beyond a reasonable doubt. Evidence indicated that Evans saw McKelton murder Allen and that Evans helped to dispose of her body. On February 24, 2009, police contacted Crystal and said they wanted to discuss Allen's death with Evans. McKelton was at home with Crystal, and the state theorized that he overheard the conversation. A few days later, Evans was murdered. Witnesses testified that McKelton later admitted to murdering Evans because he was the only person who could connect him to Allen's death.

### 2. Mitigating Factors

{¶ 335} We must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and

McKelton's "history, character, and background." R.C. 2929.04(B). In addition, we must consider the statutory mitigating factors under R.C. 2929.04: (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth), (B)(5) (lack of significant criminal history), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

### a. McKelton's mitigation hearing

{¶ 336} At the mitigation hearing, the defense presented three witnesses and McKelton's unsworn statement.

{¶ 337} Kayla McKelton, McKelton's 13-year-old daughter, described him as a "great father" and a "family man." She said that he protects and cares for her, motivates her, and promotes her education. He "has been the most important person in [her] life" and she does not "know what [she] would do without him." She gave her opinion that her father is innocent and asked the jury to impose a life sentence.

{¶ 338} Audrey McKelton, McKelton's mother, asked the jury to spare her son's life in hopes that God can save him and that he can save somebody else. She testified about McKelton's childhood in the projects. He was the second of Audrey's four children, born when she was 14 or 15 years old. His father, Calvin Johnson, abused Audrey, ignored McKelton, and did not support his family. Johnson left when McKelton was nine or ten years old.

{¶ 339} When McKelton was a child, Audrey was involved in prostitution and drugs. She was more concerned with her drugs than her children. She has convictions for felonious assault, solicitation, drug crimes, and trespassing, and she has been arrested for robbery. When she learned that McKelton was selling drugs in the projects, she was not concerned because she did not think he was hurting anyone. Instead, she believed he had the life of glamour and fame that she had wanted.

{¶ 340} Crystal Evans, the mother of McKelton's son and the sister of Germaine Evans, testified that she was "still in a state of shock" and "having a lot

of mixed emotions about the whole situation." She did not want McKelton "to get the death penalty" because she generally opposes the death penalty. She asked the jury to sentence McKelton to life in prison.

{¶ 341} Finally, McKelton gave an unsworn statement. He described how the arrival of crack in his childhood neighborhood changed his life forever. He first saw his mom get high when he was seven or eight years old. From then on, his mother was absent, often disappearing for days. For several years, he lived with his grandmother, where he slept on the floor.

{¶ 342} McKelton's brother was convicted of selling drugs, and, by age 14, McKelton was selling drugs himself. He used the money he made to care for his brother and sisters. His grandmother kicked him out of her house, and he continued to sell drugs. Later, he began robbing drug dealers and undercover federal drug agents. McKelton said he has been shot several times, once in the back of the head. His brother and several of his friends have been murdered.

{¶ 343} McKelton has become closer to his mother since his brother's death. He has three children, by three different women, and has a good relationship with his daughters. He wants to develop a relationship with his son, who was born while he was incarcerated awaiting trial. He wants an opportunity to teach his son right from wrong, to help him with problems and homework, and to encourage him to do something good with his life. McKelton also acts as a father to four nephews and three nieces and has managed to keep them off the street so far. He wants to "show [his] kids that they don't have to end up like" him.

{¶ 344} Ultimately, McKelton asked the jurors to "consider sparing [his] life." He said that he wants to live and to be part of his children's lives. He noted that he had earned a GED during an earlier prison term and expressed hope of attending college. He concluded, "I'm sorry for all the wrongdoings I ever done and "I would like to apologize to everybody I ever hurt."

### b. Weight of mitigating factors

**{¶ 345}** All the evidence McKelton presented in mitigation falls under the rubric of "history, character, and background" or "any other factors that are relevant." R.C. 2929.04(B)(7). We find nothing mitigating about "the nature and circumstances of the offense," and we see no evidence of the statutory mitigating factors enumerated in R.C. 2929.04(B)(1) through (6).

**{¶ 346}** McKelton presented evidence of his difficult childhood. He was raised in the projects by a very young mother and a father who abused the mother of his children and ignored his son. His father had left by the time McKelton was 11 years old. His mother used drugs and engaged in prostitution, often leaving McKelton and his siblings to care for themselves. Her criminal record included drug convictions, solicitation, trespassing, and felonious assault. By age 14, McKelton was living with his grandmother and selling drugs. Soon enough, he had his own list of criminal convictions. His difficult background is entitled to significant weight.

**{¶ 347}** McKelton also presented some evidence of good character regarding his closeness with family members. He said that he tries to be a positive role model to his children, as well as to his nieces and nephews, by encouraging them to not follow in his footsteps. McKelton's desire to maintain a relationship with his children is entitled to some weight.

**{¶ 348}** In his unsworn statement, McKelton indicated his desire for a college education. He noted that during a past prison term, he had obtained a GED, which indicates his ability to function while in prison. This desire for personal improvement is also entitled to modest weight.

**{¶ 349}** Finally, McKelton apologized for all his wrongs and to everyone he had hurt. However, he did not specifically mention Margaret Allen or Germaine Evans. We assign minimal weight to McKelton's general expression of remorse.

### *3. Weighing*

**{¶ 350}** The aggravating circumstance of Evans's murder outweighs the mitigating factors. McKelton has been convicted of murdering a friend who witnessed and helped him cover up a murder. By comparison, the mitigating evidence is weak. As a result, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

### *4. Proportionality*

**{¶ 351}** "We have approved death sentences in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed." *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101. *Also see Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 285-286 (murder in retaliation for grand-jury testimony); *Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 212 (murder to prevent testimony in an upcoming murder trial). The death penalty is appropriate and proportionate in this case, when compared to death sentences approved in similar cases.

### III. CONCLUSION

**{¶ 352}** We reject each of McKelton's propositions and affirm his convictions and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, and FRENCH, JJ., concur.

PFEIFER, J., concurs in part and dissents in part, with an opinion.

O'NEILL, J., concurs in part and dissents in part, with an opinion.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

**{¶ 353}** I concur in the judgment of the majority affirming the determination of McKelton's guilt. I join Justice O'Neill's dissent regarding the inadequacy of trial counsel in the sentencing phase, except to the extent that it relies

on his dissent in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 354} I concur in the majority's resolution of Calvin McKelton's various propositions of law, with the exception of his 16th and 20th propositions. Respectfully, I must dissent as to the majority's rejection of McKelton's argument that his counsel were ineffective for failing to investigate a mitigation defense. I would hold that *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), applies in this unique case. Furthermore, I must dissent from the majority's decision to affirm McKelton's sentence of death for the reasons I discussed in my dissent in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

*Unreasonable Professional Assistance*

{¶ 355} About one month before McKelton's trial, the state revealed that one of McKelton's attorneys represented more than one of the state's undisclosed witnesses, suggesting conflict-of-interest issues during trial. That attorney acknowledged his potential ethical conflict but said that he was reluctant to withdraw because he was unsure whether McKelton's other two co-counsel could effectively represent him. Two weeks later, all three defense counsel filed a motion for leave to withdraw from representation, for appointment of new counsel, and for a continuance to allow new counsel to prepare for trial. The attorneys cited a complete breakdown in the attorney-client relationship. That same day, McKelton filed a handwritten motion requesting the removal of all defense counsel. At a hearing on the motions two weeks before trial, the court granted the conflicted attorney's motion to withdraw. One of the two remaining attorneys, both certified by the Ohio Supreme Court as lead counsel in capital-murder cases, told the court that his and co-counsel's relationship with McKelton had disintegrated to the point that they could no longer "effectively represent him." McKelton, speaking from a

written statement, claimed, among other things, that his attorneys had not hired the "special experts" necessary for his death-penalty case. He added that the two remaining attorneys had met with McKelton privately only twice and that they had pressured him in the presence of an officer to plead guilty in exchange for life without parole, instead of properly investigating his case and going to trial. He claimed that one of the remaining attorneys called him a "dumb n * * * r" after he refused to take the plea agreement. He also asserted that they had aligned themselves with the prosecutor.

{¶ 356} The court denied the motions to allow the remaining attorneys to withdraw. He stated that the case preparations were proceeding in an orderly fashion and that McKelton had had three attorneys and four experts[11] working on his case. The court further pointed to the American Bar Association's 2003 Standards for Capital Litigation and told McKelton that he had been given more than the minimum recommended defense team of two attorneys and one mitigation expert. However, the record before us shows the hiring of only one investigator. The investigator worked primarily with the conflicted attorney prior to trial. One of the capital-certified attorneys met with the investigator once in June, and again the day before trial. The other capital-certified attorney met with the investigator only on the day before trial. No other experts submitted bills after trial.

{¶ 357} At the mitigation hearing, the attorneys did not present any documentary evidence of the sort that a trained mitigation specialist might find or provide.[12] But I have no doubt that this evidence exists. The record shows that

---

[11] At the arraignment almost eight months before, the court granted funds to hire an investigator, a mitigation specialist, a mental-health professional, and forensic experts.

[12]

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions,

McKelton was neglected as a child, when he was also exposed to his mother's drug use and prostitution. He grew up to become a violent and abusive adult. McKelton and a witness detailed instances of heavy alcohol use in response to strong emotional stimuli. In the modern era, people who live such a life generate a paper trail. Yet at the mitigation hearing, McKelton's attorneys presented only the testimony of his daughter, his mother, and Crystal Evans, the sister of victim Germaine Evan.

{¶ 358} To me, the record shows that McKelton's attorneys did not hire, but should have hired, a mitigation specialist to investigate his background, in addition to one or more mental-health professionals if the mitigation specialist's investigation suggested a need. During our independent weighing of the mitigating and aggravating factors in prior cases, we have given great cumulative weight not only to direct evidence of a background of alcohol use, violence, and abuse like McKelton's but also to the testimony of an expert capable of explaining to a jury the psychological and social effect that this sort of experience can have on a human being. *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 118-124, 137. *Accord State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 86-96, 105; *see also Goodwin v. Johnson*, 632 F.3d 301, 324-326

---

to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict

(Footnote omitted.) *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 9.1, Commentary, reprinted in 31 Hofstra L.Rev. 913, 959 (2003).

(6th Cir.2011). Instead of arranging for the inquiry of a mitigation expert, counsel went so far as to tell the jury that McKelton could have presented testimony of a mental-health professional but that such testimony would have been "a bunch of psycho babble." Frankly speaking, a license to practice law does not qualify counsel to make that decision for a client.[13]

{¶ 359} The majority points to trial counsel's statements that they had hired the experts for which funding had been authorized. Majority opinion at ¶ 73. But the record shows that no expert with qualifying social work or psychological degrees or experience showed up asking for even a small amount of money. This strongly undermines the majority's position about what happened while counsel prepared for this case. The best the majority can say is that "trial counsel may have reasonably decided not to present a mental-health professional or a mitigation specialist for strategic reasons." Majority opinion at ¶ 307. But on this record as a whole, I must respectfully disagree. I believe it is much more likely that counsel unreasonably decided not to engage any qualified person as a matter of expedience. *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), quoting *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances' "); *State v. Johnson*, 24 Ohio St.3d 87, 90, 494 N.E.2d 1061 (1986). And without someone qualified to screen McKelton for

---

[13]

> Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

(Footnote omitted.) *American Bar Association Guidelines, Guideline 4.1, Commentary, reprinted in 31 Hofstra L.Rev.* at 956-957.

the possible psychological and social consequences of his hard-lived background, there cannot have been the constitutionally guaranteed reasonable professional investigation. *Strickland* at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). *Accord State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 76-77. For these reasons, I would hold that McKelton satisfied his burden to prove unreasonable professional assistance.

*Prejudice*

{¶ 360} I believe that the circumstances in this exceptional case demand a legal standard less rigid than the one applied under *Strickland*. Under *Strickland*, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Id.* at 686. Counsel plays that role by subjecting the state's case to "the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). When an attorney fails to play that role, the Sixth Amendment to the United States Constitution requires confidence in the reliability of the outcome of a proceeding. *Strickland* at 696. For that reason, a professional error by counsel "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

{¶ 361} In Ohio as elsewhere, courts have boiled off the fat of the Sixth Amendment, applying a mechanical "*Strickland* test" that requires meeting two prongs: (1) demonstrating deficient performance of counsel and (2) demonstrating prejudice. 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, citing *Strickland* at 691. In this case, the majority holds that McKelton cannot meet the prejudice prong under *Strickland*, given the record before us. Majority opinion at ¶ 305. We "cannot look outside of the record" in a death-penalty appeal, *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 62, to determine

what evidence a mitigation or mental-health specialist would have found or offered for McKelton in support of a sentence less than death.

{¶ 362} In *Hester*, issued eight years before *Strickland*, we formulated a somewhat different standard for determining ineffective assistance of counsel under Article I, Sections 10 and 16 of the Ohio Constitution. *Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304. There, we held that the test for ineffective assistance of counsel under "the Fifth, Sixth and Fourteenth Amendments, and Sections 10 and 16 of Article I of the Ohio Constitution" was "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."[14] *Hester,* 45 Ohio St.2d at 79, 341 N.E.2d 304. We decided to apply this test "on a case-to-case basis," likening that approach to application of the exclusionary rule under the Fourth Amendment. *Id.* at 80. We are thus empowered to apply *Hester* selectively. And we have been cautious in not letting these floodgates open too far, having applied the "fair trial and substantial justice" standard only twice in the last century: *Hester* and *Cornwell v. State*, 106 Ohio St. 626, 628, 140 N.E. 363 (1922).

{¶ 363} Despite rare application, *Hester* is nonetheless controlling precedent governing the standard for ineffective assistance of counsel under Sections 10 and 16 of Article I of the Ohio Constitution, as we have never explicitly overruled it. Shortly after *Hester*, we elaborated upon this standard, saying that when considering effective-assistance claims, a two-step analysis like the one that would later be adopted in *Strickland* is "usually" applied. *State v. Lytle*, 48 Ohio St.2d 391, 396, 358 N.E.2d 623 (1976), vacated in part on other grounds, *Lytle v. Ohio*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978). After *Strickland*, we commented, without any analysis, that "[t]he test enunciated in *Strickland* is essentially the same" as the one we adopted in *Hester* and *Lytle*. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985); *see also Bradley*, 42 Ohio St.3d at

---

[14] The two-part test in *Strickland* preempts *Hester* on its interpretation of the United States Constitution. United States Constitution, Article VI, cl. 2.

141-142, 538 N.E.2d 373. But *Hester* is still good law. After all, the Ohio Supreme Court does not overrule precedent sub silentio. *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 1 ("It is only with great solemnity and with the assurance that the newly chosen course for the law is a significant improvement over the current course that we should depart from precedent").

{¶ 364} As we said in *Smith*, the rules laid down in *Strickland* and *Hester* are the same *in essence*, but they are not identical standards. *Smith* at 100. In the typical case, "substantial justice" is done because the record suggests no reasonable probability that the outcome of a proceeding would have been different. It is analytically possible in rare and exceptional circumstances, however, that an individual may be able to show that counsel's assistance fell so far below the minimum professional standards that the proceeding was basically unfair and substantially unjust, even if the record suggests that the outcome of a proceeding would probably not have been different. In those circumstances, *Hester* requires a new trial.

{¶ 365} *Hester* is uniquely appropriate for application in capital-murder cases because the demands of due process are at their strongest when the result of a proceeding may be death. *See Ford v. Wainwright*, 477 U.S. 399, 414, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (discussing the "heightened concern for fairness and accuracy that has characterized the [United States Supreme Court's] review of the process requisite to the taking of a human life"). This is especially true because *Hester*'s standard is predicated upon *both* the guarantees of counsel, Ohio Constitution, Article I, Section 10, and of due process under Ohio Constitution, Article I, Section 16. *Hester*, 45 Ohio St.2d at 79, 341 N.E.2d 304. At its heart, the *Hester* standard differs from *Strickland* because of the unique guarantee of "justice" within Article I, Section 16 of our state constitution—a word that goes unmentioned by the Bill of Rights or the Fourteenth Amendment to the United

States Constitution. In contrast, *Strickland*'s standard is a pure creature of the Sixth Amendment, which is focused upon the reliability of the proceeding. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. The United States Constitution guarantees a fair trial under the Fourteenth Amendment through application of the Sixth Amendment—not so much independently from it. *Id.* at 684-685.

{¶ 366} Throwing McKelton into the fray with attorneys he had barely met was profoundly unfair: their task was to provide the jury with a detailed story of the person that they represented. I am convinced that Calvin McKelton's attorneys were insufficiently prepared to go forward at the mitigation hearing due to a professionally inadequate investigation prior to trial and the unexpected scramble of taking over the work of another seasoned trial attorney. For these reasons, I have no faith in the jury's recommended sentence. I will not place the ends of justice—a reliable outcome—before the means of justice in the context of a capital-sentencing hearing. For that reason, I am entirely comfortable reversing Calvin McKelton's death sentence without strict proof in the record that counsel would have turned up silver- bullet mitigation evidence had they hired an expert to look for it. For me, it is enough that counsel did not hire an expert qualified to look before deciding not to present any "psycho-babble." Accordingly, I would apply *Hester*, reverse McKelton's death sentence, and remand for a new mitigation hearing.

{¶ 367} The majority instead rejects McKelton's argument that his attorneys were ineffective for failing to conduct a complete investigation into his background prior to mitigation. The majority does not limit or overrule our decision in *State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 102-104, in which we held that counsel have a duty to conduct at least enough investigation of potential mitigation evidence to make a reasonable decision not to investigate further. Rather, the majority thinks that McKelton's ineffective-assistance argument necessarily requires evidence of prejudice that may exist

outside the record, which we cannot consider in this appeal. Majority opinion at ¶ 79; *State v. Keith*, 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47 (1997). McKelton's prejudice claim is proper for a postconviction proceeding because he could develop a record by which to compare the evidence found and presented by postconviction counsel to the evidence presented by trial counsel. *Keith* at 536-537, citing *State v. Scott,* 63 Ohio App.3d 304, 308, 578 N.E.2d 841 (8th Dist.1989).

*Collateral Proceedings*

**{¶ 368}** McKelton's postconviction petition is currently pending as a discretionary appeal to this court. His petition to the trial court argued, among other things, that counsel failed to conduct an adequate mitigation investigation, requested leave to conduct discovery on that issue, and requested funds to hire "a forensic ophthalmologist, a neuropsychologist and a substance abuse expert." *State v. McKelton*, 12th Dist. Butler No. CA2015–02–028, 2015-Ohio-4228, ¶ 4, 8. McKelton's petition was denied without a hearing, and not because he failed to " 'set forth sufficient operative facts to establish substantive grounds for relief.' " *Id*. at ¶ 10, quoting *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), paragraph two of the syllabus. Instead, McKelton's petition was denied on the sole basis of res judicata, because all the claims he raised had already been raised or could have been raised in this appeal.

**{¶ 369}** The court of appeals affirmed on appeal, explaining that the same ineffective-assistance argument this court now declines to address due to lack of evidence in the record is the kind of argument that "could fairly have been determined without resort to evidence outside the record." *McKelton*, 2015-Ohio-4228, ¶ 27, quoting *State v. Sturgill*, 12th Dist. Clermont Nos. CA2014–01–003 and CA2014–07–049, 2014–Ohio–5082, ¶ 13. As a result, there has been no hearing or discovery, nor has there been any real consideration of the merits of McKelton's argument. Nobody has called trial counsel out onto the carpet to ask

whether they came to a reasonable professional decision not to use the information in McKelton's "one thousand plus pages of exhibits" submitted with his postconviction-relief petition, *McKelton* at ¶ 8, or simply never hired a mitigation specialist qualified and trained to look for it.

{¶ 370} Justice has not been served. Even agreeing that McKelton is one of the most dangerous criminals in the state, who admitted his own responsibility in starting what sounds like a war among drug dealers in Cincinnati, he is a human being, guaranteed the minimum constitutional protections of a fair trial, with adequate counsel and meaningful appellate review. I sincerely hope that my colleagues will take action when McKelton's postconviction appeal comes before the court for consideration. If we do not accept McKelton's discretionary appeal, his ineffective-assistance argument will have been denied by every court involved, without a single judge taking a critical look at the evidence outside of the record and determining whether his trial attorneys did or did not look for it.

{¶ 371} For these reasons, I dissent.

PFEIFER, J., concurs in the foregoing opinion except as noted in his separate opinion.

_____

Michael Gmoser, Butler County Prosecuting Attorney, and Michael A. Oster Jr. and Lina N. Alkamhawi, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Rachel Troutman, Allen Vender, and Shawn Welch, Assistant Public Defenders, for appellant.

_____